## Case No. 12,578a.

### The SEA GULL.

[16 Pittsb. Leg. J. (O. S.) 194.]

Circuit Court, D. Maryland.

SHIPPING—CARE IN NAVIGATION—MARITIME TORT — DAMAGES FOR WRONGFUL KILLING.

1. A steamer, leaving a crowded port, is bound to use special diligence and care in navigation; otherwise she will be held responsible for damages occurring to sailing vessels, in consequence of collision, in the default of clear proof of fault on their part.

2. A wife, whose husband is engaged in navigating a row boat in the harbor of Baltimore, and is killed by collision with a departing steamer, navigating the waters of the harbor without sufficient caution, is entitled to recover damages in an action against the steamer.

[Appeal from the district court of the United States for the district of Maryland.]

CHASE, Circuit Justice. I have given a careful consideration to the case of Mary Brannick v. The Sea Gull. In this class of cases, it is almost always extremely difficult to come to a satisfactory conclusion. The conflict of evidence is usually great, and the judge is much embarrassed by the diversities and contradictions of statements, coming from witnesses apparently of equal credit. In a large number the result is determined by a slight preponderance of testimony. In this case the steamer Sea Gull was going out of the port of Baltimore. There is a good deal of difference among the witnesses on the question, whether or not she was moving with greater or less than ordinary speed. For the purposes of this case, I will take it, as proved, that she was moving with no more, if not with less, than common swiftness. But she was going out of a crowded harbor, where very great caution and very great care were necessary; and it is a reasonable rule that, if collision occurs with a sailing vessel, or any smaller craft, which causes injury to person or property, the

steamer, being much the strongest vessel, and having almost always the best and most experienced officers, and being usually under the best control, must make a clear case of freedom from fault in order to escape responsibility for the loss. In this case it seems that the steamer was going out of the harbor, and that a small boat, with a crew of two men, towing some small piece of timber called by one of the witnesses a scow-oar, was pulling across the harbor almost in front of the steamer. Some of the witnesses say that she was pulling directly towards the steamer, but that can hardly be possible. The weight of the evidence is, that the boat was crossing from one side of the harbor to the other, and it has not been claimed that she was where she had no right to be. Some of the witnesses say that, if she had kept ahead instead of turning round no collision would have occurred. Others assert the contrary. My own judgment is, that escape had become impossible when she was observed from the steamer. Whether this be so or not, it is clear enough that the men in the boat were pursuing their ordinary business in the harbor, and, if the imminence of the peril was produced by the fault of the steamer, and, in the alarm occasioned by it, an error was ignorantly committed, which increased the danger to a small boat, that error will not excuse the steamer. It is true that the steamer seems to have been engaged in her regular and proper business. The captain and most of the officers seem to have been competent, and to have been doing their duty, but somehow or other the steamer did run directly afoul of this little craft, and why? I am obliged to come to the conclusion, upon a pretty careful examination, that it was because there was not sufficient lookout on the steamer.

The testimony for the appellees, in this case, is contradictory. There is some of it which indicates there was a lookout, and some of it which indicates there was none. I think the weight of the testimony is that there was no alarm given by anybody, in respect to this particular boat, except by Vernon, a hand on the steamer, who, I understand, was on the portside, and gave the alarm of "boat ahead." He says, and his son says, (and they were both together, and both saw the same thing,) that they heard no other cry than that the ringing of the bell by the captain, attempting to stop the vessel, immediately succeeded upon the alarm which they gave. On the other hand, it is said that a Mr. Leary was on the lookout. He says that he himself gave the alarm. It is certain that he did give an alarm, but there was a tug-boat also in the way, and with every disposition to reconcile all the testimony together, and not desiring to attribute false swearing or misrepresentation to anybody, I am induced to think that he confounds an alarm which he gave in respect to the tug-boat with the alarm which he supposes himself to have given concerning the small boat. These alarms might easily be confounded together, but so far as this particular little vessel is con-

cerned, nothing seems really certain except that an alarm was given by Vernon, or his son, when she was immediately under the steamer and when there was no sufficient opportunity for her to escape. She tried to get away, but failed.

It is quite possible, it seems to me, that the attention of the captain was drawn to the tug, and afterwards, when too late, he found that the accident had occurred to the row boat. He could not see her, nor could any body, from the pilot house. It would have been very difficult, indeed, for any body to see her, except from the bow, where the lookout ought to have been, but was not. The men in the tow boat escaped, and the men who were in another row boat near by say that the captain was fully advised; that he was alarmed in time to prevent the accident. I do not think he was. His attention was probably engrossed by the larger vessel, while this little boat was suffered to get immediately under the bow of the steamer before it was noticed by him. Under these circumstances I think the steamer was in fault, and is responsible for the damage that occurred. One of the men in the row boat was killed or drowned. At first, I doubted whether this man did not himself leap into the water, in anticipation of the collision, and whether damages could be claimed of the steamer for that, but I am satisfied, upon the whole testimony, and especially from that of the men who witnessed what occurred from the other row boat—men who were entirely disinterested, and not connected with any of those parties—that the man was knocked out, rather than that he jumped out, of the boat.

I shall, therefore, decree against the steamer for damages to the libelant for the loss of her husband. It is not very easy to assess the damages. They must not be determined by sympathy; and it is hard to say what the actual damage to the wife was, but I have given the best construction I could to the matter, and will enter a decree for $1,000 against the steamer. I ought to say that a good deal of this testimony, which was taken during the past week, was not before my brother, the district judge, when this case was decided below.