# KERNAN, ADMINISTRATOR, *v.* AMERICAN DREDGING CO.

No. 34.   Argued November 21, 1957.—Decided February 3, 1958.

*Abraham E. Freedman* argued the cause and filed a brief for petitioner.

*T. E. Byrne, Jr.* argued the cause for respondent. With him on the brief was *Mark D. Alspach.*

MR. JUSTICE BRENNAN delivered the opinion of the Court.

In this limitation proceeding brought by the respondent under §§ 183–186 of the Limited Liability Act, R. S. §§ 4281–4289, as amended, 46 U. S. C. §§ 181–196, the District Court for the Eastern District of Pennsylvania denied the petitioner's claim for damages filed on behalf of the widow and other dependents of a seaman who lost his life on respondent's tug in a fire caused by the violation of a navigation rule. 141 F. Supp. 582. The Court of Appeals for the Third Circuit affirmed. 235 F. 2d 618, rehearing denied, 235 F. 2d 619. We granted certiorari. 352 U. S. 965.

The seaman lost his life on the tug *Arthur N. Herron,* which, on the night of November 18, 1952, while towing a scow on the Schuylkill River in Philadelphia, caught fire when an open-flame kerosene lamp on the deck of the scow ignited highly inflammable vapors lying above an extensive accumulation of petroleum products spread over the surface of the river. Several oil refineries and facilities for oil storage, and for loading and unloading petroleum products, are located along the banks of the Schuylkill River. The trial court found that the lamp was not more than three feet above the water. Maintaining the lamp at a height of less than eight feet violated a navigation rule promulgated by the Commandant of the United States Coast Guard.[1] The trial court found that

---

[1] 33 CFR § 80.16 (h). "Scows not otherwise provided for in this section on waters described in paragraph (a) of this section shall

the vapor would not have been ignited if the lamp had been carried at the required height.

The District Court held that the violation of the rule, "whether . . . [it] be called negligence or be said to make the flotilla unseaworthy," did not impose liability because "the Coast Guard regulation had to do solely with navigation and was intended for the prevention of collisions, and for no other purpose. In the present case there was no collision and no fault of navigation. True, the origin of the fire can be traced to the violation of the regulation, but the question is not causation but whether the violation of the regulation, of itself, imposes liability." 141 F. Supp., at 585.

The petitioner urges first that the statutory violation made the flotilla unseaworthy, creating liability without regard to fault. But the remedy for unseaworthiness derives from the general maritime law, and that law recognizes no cause of action for wrongful death whether

carry a white light at each end of each scow, except that when such scows are massed in tiers, two or more abreast, each of the outside scows shall carry a white light on its outer bow, and the outside scows in the last tier shall each carry, in addition, a white light on the outer part of the stern. The white light shall be carried not less than 8 feet above the surface of the water, and shall be so placed as to show an unbroken light all around the horizon, and shall be of such a character as to be visible on a dark night with a clear atmosphere at a distance of at least 5 miles."

The Commandant is empowered by 30 Stat. 102, as amended, 33 U. S. C. § 157, to establish rules "as to the lights to be carried . . . as he . . . may deem necessary for safety . . . ." This section was contained in the Act of June 7, 1897, the purpose of which was to codify the rules governing navigation on inland waters and to conform them as nearly as practicable to the revised international rules for preventing collisions at sea adopted at the International Marine Conference in October 1889. 30 Cong. Rec. 1394; H. R. Doc. No. 42, 55th Cong., 1st Sess., p. 1.

occasioned by unseaworthiness or by negligence. *The Harrisburg,* 119 U. S. 199; [2] see *Western Fuel Co.* v. *Garcia,* 257 U. S. 233, 240. Before the Jones Act,[3] federal courts of admiralty resorted to the various state death acts to give a remedy for wrongful death. *The Hamilton,* 207 U. S. 398; *The Transfer No. 4,* 61 F. 364; see *Western Fuel Co.* v. *Garcia, supra,* at 242; *Great Lakes Dredge & Dock Co.* v. *Kierejewski,* 261 U. S. 479. The Jones Act created a federal right of action for the wrongful death of a seaman based on the statutory action under the Federal Employers' Liability Act. In *Lindgren* v. *United States,* 281 U. S. 38, the Court held that the Jones Act remedy for wrongful death was exclusive and precluded any remedy for wrongful death within territorial

---

[2] *The Harrisburg* disapproved lower federal court cases, among them a decision of Chief Justice Chase at Circuit, *The Sea Gull,* 21 Fed. Cas. 910, No. 12578a, which had given a right of action for wrongful death. Reliance was placed on the fact that English admiralty law did not recognize the cause of action although continental maritime law did. By statute, English admiralty courts now entertain a cause of action for wrongful death. 23 Halsbury's Laws of England (2d ed. 1936) § 979.

[3] "Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply; and in case of the death of any seaman as a result of any such personal injury the personal representative of such seaman may maintain an action for damages at law with the right of trial by jury, and in such action all statutes of the United States conferring or regulating the right of action for death in the case of railway employees shall be applicable. [*I. e.,* Federal Employers' Liability Act, 35 Stat. 65, as amended, 45 U. S. C. §§ 51–60.] Jurisdiction in such actions shall be under the court of the district in which the defendant employer resides or in which his principal office is located." 41 Stat. 1007, 46 U. S. C. § 688.

waters,[4] based on unseaworthiness, whether derived from federal or state law. The petitioner assumes that under today's general maritime law the personal representative of a deceased seaman may elect, as the seaman himself may elect, between an action based on the FELA and an action, recognized in *The Osceola,* 189 U. S. 158, 175, based upon unseaworthiness. In view of the disposition we are making of this case, we need not consider the soundness of this assumption.

The petitioner also urges that, since the violation of the rule requiring the lights to be eight feet above the water resulted in a defect or insufficiency in the flotilla's lighting equipment which in fact caused the seaman's death, liability was created without regard to negligence under the line of decisions of this Court in actions under the FELA based upon violations of either the Safety Appliance Acts[5] or the Boiler Inspection Act.[6] That line of decisions interpreted the clause of § 1 of the FELA, 45 U. S. C. § 51, which imposes liability on the employer "by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment." The cases

---

[4] Where death occurs beyond a marine league from state shores, the Death on the High Seas Act, 41 Stat. 537, 46 U. S. C. §§ 761–768, provides a remedy for wrongful death. Presumably any claims, based on unseaworthiness, for damages accrued prior to the decedent's death would survive, at least if a pertinent state statute is effective to bring about a survival of the seaman's right. See *Holland* v. *Steag, Inc.,* 143 F. Supp. 203; cf. *Cox* v. *Roth,* 348 U. S. 207; *Just* v. *Chambers,* 312 U. S. 383. Claims for maintenance and cure survive the death of the seaman. *Sperbeck* v. *A. L. Burbank & Co.,* 190 F. 2d 449. For a discussion of the applicability of a state wrongful-death statute to an action for death of a nonseaman based upon a breach of the warranty of seaworthiness, see *Skovgaard* v. *The Tungus,* 252 F. 2d 14.

[5] 27 Stat. 531, as amended, 45 U. S. C. §§ 1–16.

[6] 36 Stat. 913, as amended, 45 U. S. C. §§ 22–34.

hold that under this clause, a defect resulting from a violation of either statute which causes the injury or death of an employee creates liability without regard to negligence. *San Antonio & A. P. R. Co.* v. *Wagner*, 241 U. S. 476, 484. Here the defect or insufficiency in the flotilla's lighting equipment due to a violation of the statute resulted in the death of the seaman. The question for our decision is whether, in the absence of any showing of negligence, the Jones Act—which in terms incorporates the provisions of the FELA—permits recovery for the death of a seaman resulting from a violation of a statutory duty. We hold that it does.

In denying the claim the lower courts relied upon their views of general tort doctrine. It is true that at common law the liability of the master to his servant was founded wholly on tort rules of general applicability and the master was granted the effective defenses of assumption of risk and contributory negligence. This limited liability derived from a public policy, designed to give maximum freedom to infant industrial enterprisés, "to insulate the employer as much as possible from bearing the 'human overhead' which is an inevitable part of the cost—to someone—of the doing of industrialized business." *Tiller* v. *Atlantic Coast Line R. Co.,* 318 U. S. 54, 59. But it came to be recognized that, whatever the rights and duties among persons generally, the industrial employer had a special responsibility toward his workers, who were daily exposed to the risks of the business and who were largely helpless to provide adequately for their own safety. Therefore, as industry and commerce became sufficiently strong to bear the burden, the law, the reflection of an evolving public policy, came to favor compensation of employees and their dependents for the losses occasioned by the inevitable deaths and injuries of industrial employment, thus shifting to industry the "human overhead" of doing business. For most indus-

tries this change has been embodied in Workmen's Compensation Acts. In the railroad and shipping industries, however, the FELA and Jones Act provide the framework for determining liability for industrial accidents. But instead of a detailed statute codifying common-law principles, Congress saw fit to enact a statute of the most general terms, thus leaving in large measure to the courts the duty of fashioning remedies for injured employees in a manner analogous to the development of tort remedies at common law. But it is clear that the general congressional intent was to provide liberal recovery for injured workers, *Rogers* v. *Missouri Pacific R. Co.*, 352 U. S. 500, 508–510, and it is also clear that Congress intended the creation of no static remedy, but one which would be developed and enlarged to meet changing conditions and changing concepts of industry's duty toward its workers.

The FELA and the Jones Act impose upon the employer the duty of paying damages when injury to the worker is caused, in whole or in part, by the employer's fault. This fault may consist of a breach of the duty of care, analogous but by no means identical to the general common-law duty, or of a breach of some statutory duty. The tort doctrine which the lower courts applied imposes liability for violation of a statutory duty only where the injury is one which the statute was designed to prevent.[7] However, this Court has repeatedly refused to apply such a limiting doctrine in FELA cases. In FELA cases based upon violations of the Safety Appli-

---

[7] The trial court relied upon Restatement, Torts, § 286, Comment on Clause (c), h: "A statute or ordinance may be construed as intended to give protection against a particular form of harm to a particular interest. If so, the actor cannot be liable to another for a violation of the enactment unless the harm which the violation causes is that from which it was the purpose of the enactment to protect the other."

ance Acts or the Boiler Inspection Act, the Court has held that a violation of either statute creates liability under FELA if the resulting defect or insufficiency in equipment contributes in fact to the death or injury in suit, without regard to whether the injury flowing from the breach was the injury the statute sought to prevent. Since it appears in this case that the defect or insufficiency of the flotilla's lighting equipment resulting from the violation of 33 U. S. C. § 157 actually caused the seaman's death, this principle governs and compels a result in favor of the petitioner's claim.

In *Louisville & N. R. Co.* v. *Layton,* 243 U. S. 617, a railroad employee on one of five freight cars loaded with coal was thrown to the track and injured when an engine pushed a stock car into the last of the loaded cars and drove the five cars against a standing train. Neither the stock car nor the car which it struck was equipped with automatic couplers, as required by the Federal Safety Appliance Act. Had the cars been so equipped they would have coupled when they came together and the five cars would not have run against the standing train. The stated purpose of the automatic coupler requirement was to avoid "the necessity of men going between the ends of cars," and the railroad contended that this showed that the Congress intended the requirement only for the benefit of employees injured when between cars for the purpose of coupling or uncoupling them. The Court rejected the argument and affirmed a judgment for the plaintiff.

In *Minneapolis & St. L. R. Co.* v. *Gotschall,* 244 U. S. 66, a brakeman walking along the tops of the cars of a moving train was thrown off and killed when the train separated because of the opening of a coupler which resulted in an automatic setting of the emergency brakes and a sudden jerk of the train. This Court sustained a

judgment against the railroad although the injury was not one which the Safety Appliance Act aims to prevent.

In *Davis* v. *Wolfe,* 263 U. S. 239, the conductor of a moving train holding on to the grab iron directly over the sill-step on which he stood fell because the grab iron was loose and defective. It was contended that the grab iron was required to aid employees engaged in coupling or uncoupling cars or a service connected therewith, not to aid in the transportation of employees. The Court rejected this contention and held that the *Layton* and *Gotschall* cases had settled that the employee ". . . can recover if the failure to comply with the requirements of the [Safety Appliance] act is a proximate cause of the accident, resulting in injury to him while in the discharge of his duty, although not engaged in an operation in which the safety appliances are specifically designed to furnish him protection." *Id.,* at 243.

In *Swinson* v. *Chicago, St. P., M. & O. R. Co.,* 294 U. S. 529, a freight brakeman was releasing a tightly set hand brake at the end of a tank car. Release of the hand brake required the application of considerable force to the brake wheel. The brakeman put his left foot on the running board and his right foot on the grab iron to set himself better to put pressure on the brake wheel. The foot pressure exerted on the grab iron caused the plank to which it was attached to split and one of the bolts securing the grab iron to be pulled through. As a result the brakeman lost his balance and was seriously injured in a fall in front of the moving car. The railroad contended, unsuccessfully, that it was not liable because the grab iron had been used by the brakeman for a purpose for which it was not intended, arguing that the duty to supply grab irons was intended by Congress in order to provide employees with an appliance to grasp with the hands, not to provide a foot brace or support to secure leverage in releasing a hand brake.

In *Coray* v. *Southern Pacific Co.,* 335 U. S. 520, an employee of the railroad, riding a motor-driven track car behind a moving freight train, was killed in a crash of the track car into the freight train which stopped suddenly when its brakes locked because of a defect in its braking system. The Supreme Court of Utah affirmed the state trial court's direction of verdict for the railroad upon the ground that, in so far as brakes were concerned, the object of the Safety Appliance Act was not to protect employees from standing trains, but from moving trains. The Utah Supreme Court also reasoned that the stopping of the train in consequence of the leak in the valve was precisely what, as a safety device, it was designed to do. This Court reversed and said, *id.,* at 524:

"The language selected by Congress to fix liability in cases of this kind is simple and direct. Consideration of its meaning by the introduction of dialectical subtleties can serve no useful interpretative purpose. The statute declares that railroads shall be responsible for their employees' deaths 'resulting in whole or in part' from defective appliances such as were here maintained. 45 U. S. C. § 51. And to make its purpose crystal clear, Congress has also provided that 'no such employee . . . shall be held to have been guilty of contributory negligence in any case' where a violation of the Safety Appliance Act, such as the one here, 'contributed to the . . . death of such employee.' 45 U. S. C. § 53. Congress has thus for its own reasons imposed extraordinary safety obligations upon railroads and has commanded that if a breach of these obligations contributes in part to an employee's death, the railroad must pay damages. These air-brakes were defective; for this reason alone the train suddenly and unexpectedly stopped; a motor track car following at about the same rate of speed and operated by an employee looking in

"another direction crashed into the train; all of these circumstances were inseparably related to one another in time and space. The jury could have found that decedent's death resulted from any or all of the foregoing circumstances."

Finally, in *Urie* v. *Thompson,* 337 U. S. 163, the Court considered a claim based upon an alleged violation of an Interstate Commerce Commission regulation promulgated under the Boiler Inspection Act. The regulation provided: "Locomotives shall be equipped with proper sanding apparatus, which shall be maintained in safe and suitable condition for service, and tested before each trip. Sand pipes must be securely fastened in line with the rails." *Id.,* at 195. The purpose of the requirement was to provide sand for traction. A fireman employed by the railroad for almost thirty years sued to recover damages for silicosis allegedly contracted from the inhalation of silicate dust emitted by allegedly broken or faultily adjusted sanders into the decks and cabs of the many locomotives on which he had worked. The railroad contended that the ICC rule was designed to ensure an adequate auxiliary braking system, not to protect employees against silicosis, and therefore the employee could not recover for an injury not of the kind the ICC rule sought to guard against. The Court rejected the argument as resting on general tort doctrine inapplicable to this case.

The decisive question in this case, then, is whether the principles developed in this line of FELA cases permit recovery for violation of this navigation statute or are limited, as the dissenting opinion would have it, to cases involving the Safety Appliance and Boiler Inspection Acts. Our attention is directed to the provisions of § 4 of the FELA, which makes reference to "any statute enacted for the safety of employees . . . ," and it is urged that this phrase, in some unexplained manner,

creates a special relationship between the FELA and the Safety Appliance and Boiler Inspection Acts. Several answers may be given to this contention.

First, § 4 relates entirely to the defense of assumption of risk, abolishing this defense where the injury was caused by the employer's negligence or by "violation . . . of any statute enacted for the safety of employees . . . ." It is § 1 of the FELA which creates the cause of action and this section, on its face, is barren of any suggestion that injuries caused by violation of *any* statute are to be treated specially. In formulating the rule that violation of the Safety Appliance and Boiler Inspection Acts creates liability for resulting injuries without proof of negligence, the Court relied on judicially evolved principles designed to carry out the general congressional purpose of providing appropriate remedies for injuries incurred by railroad employees. For Congress, in 1908, did not crystallize the application of the Act by enacting specific rules to guide the courts. Rather, by using generalized language, it created only a framework within which the courts were left to evolve, much in the manner of the common law, a system of principles providing compensation for injuries to employees consistent with the changing realities of employment in the railroad industry.

Second, it is argued that the Safety Appliance and Boiler Inspection Acts are special safety statutes and thus may easily be assimilated to the FELA under general common-law principles. But there is no magic in the word "safety." In the cases we have discussed it was regarded as irrelevant that the defects in the appliances did not disable them from performing their intended safety function. For instance, in *Gotschall* the coupling defect parting the cars resulted in the automatic setting of the emergency brakes as a safety measure. In *Coray* the train stopped due to the operation of the very safety mechanism required by the

statute. In *Urie* the defect in the sanders which caused sand to come into the locomotive cabs in no wise impaired the designed safety function of the sanders—to provide sand for traction. We think that the irrelevance of the safety aspect in these cases demonstrates that the basis of liability is a violation of statutory duty without regard to whether the injury flowing from the violation was the injury the statute sought to guard against. It must therefore be concluded that the nature of the Acts violated is not a controlling consideration; the basis of liability is the FELA.[8]

The courts, in developing the FELA with a view to adjusting equitably between the worker and his corporate employer the risks inherent in the railroad industry, have plainly rejected many of the refined distinctions necessary in common-law tort doctrine for the purpose of allocating risks between persons who are more nearly on an equal footing as to financial capacity and ability to avoid the hazards involved. Among the refinements developed by the common law for the purpose of limiting the risk of liability arising from wrongful conduct is the rule that violation of a statutory duty creates liability only when the statute was intended to protect those in the position of the plaintiff from the type of injury in fact incurred. This limiting approach has long been discarded from the FELA. Instead, the theory of the FELA is that where the employer's conduct falls short of the high standard

---

[8] The dissenters argue that the Safety Appliance and Boiler Inspection Acts were each prefaced by the statement: "An Act to promote the safety of employees and travelers . . . ." But we are not persuaded that liability under the FELA should depend on the title of the Acts whose violation is alleged. Were we to rely on such indicia we could point out that the statute here involved empowered the Commandant of the Coast Guard to establish rules "as to the lights to be carried . . . as he . . . *may deem necessary for safety* . . . ." 30 Stat. 102, 33 U. S. C. § 157. (Emphasis added.)

required of him by this Act, and his fault, in whole or in part, causes injury, liability ensues. And this result follows whether the fault is a violation of a statutory duty or the more general duty of acting with care, for the employer owes the employee, as much as the duty of acting with care, the duty of complying with his statutory obligations.

We find no difficulty in applying these principles, developed under the FELA, to the present action under the Jones Act, for the latter Act expressly provides for seamen the cause of action—and consequently the entire judicially developed doctrine of liability—granted to railroad workers by the FELA. The deceased seaman here was in a position perfectly analogous to that of the railroad workers allowed recovery in the line of cases we have discussed, and the principles governing those cases clearly should apply here.

The judgment of the Court of Appeals is reversed with direction to remand to the District Court for further proceedings not inconsistent with this opinion.

*Reversed.*

Memorandum of MR. JUSTICE FRANKFURTER.

Since it has been my general practice for on to a decade to refrain from participating in the substantive disposition of cases arising under the Federal Employers' Liability Act and the Jones Act that have been brought here on writ of certiorari, a word explaining my participation today is in order.

After persistent protest against granting petitions for certiorari to review judgments in the state courts and the United States Courts of Appeals involving application of the Federal Employers' Liability Act, I deemed it necessary to register my conviction on the unjustifiability of granting such petitions by noting that the petitions were

improvidently granted. See my opinion in *Rogers* v. *Missouri Pacific R. Co.*, 352 U. S. 500, 524. All these cases involved evaluation of evidence: evidence on what constitutes "negligence," *i. e.*, the common-law conception of negligence which Congress adopted, subject to qualifications regarding "causation" and withdrawal of common-law defenses, and which remains the statutory requisite for liability. It has become the practice for this Court to review evidence where trial courts have considered it their duty to take cases from juries or to set aside jury verdicts, or where appellate courts have reversed trial court decisions as to what are allowable verdicts by juries. This manifestly ceased to be the function of this Court after Congress, by the Act of September 6, 1916, 39 Stat. 726, abolished appeals to the Court in Federal Employers' Liability Act cases and restricted review of lower court decisions in such cases to the confined scope of our general certiorari jurisdiction.

I am aware of the suggestion that these cases, at least those coming from the Courts of Appeals, involve a constitutional issue—namely, the application of the Seventh Amendment. That, I should suppose, would be equally true of every case in the federal courts in which the claim is made that a case should have been left to the jury, and equally, of course, such claims (in non-FELA cases, at any rate) are here denied, except in the most flagrant instances. This Court has said again and again, in other than FELA cases, that questions of fact—and that is essentially what these negligence cases involve—afford an inadmissible basis for review by this Court. And this for the conclusive reason that deliberate consideration and wise adjudication of the cases that concededly ought to be reviewed here make a demand greater than the resources of time and thought possessed by this Court, no matter how ably constituted, reasonably afford. See

*Ex parte Peru,* 318 U. S. 578, 602–603 (dissenting opinion).

This case is different in kind from those in which I have felt it my duty to abstain from consideration on the merits. This is a case which involves a serious question of construction of a statute of nationwide importance. Such questions of construction are ,among the most important issues for final determination by this Court. I therefore reach the merits, and on the merits I join the opinion of MR. JUSTICE HARLAN.

MR. JUSTICE HARLAN, whom MR. JUSTICE FRANK-FURTER, MR. JUSTICE BURTON, and MR. JUSTICE WHIT-TAKER join, dissenting.

I share the view of the Court that under existing law a cause of action for wrongful death does not lie on principles of unseaworthiness, and that therefore respondent's liability for the death caused by this unfortunate accident depends entirely on the Jones Act, 41 Stat. 1007, 46 U. S. C. § 688, which incorporates the provisions of the Federal Employers' Liability Act, 35 Stat. 65, as amended, 45 U. S. C. §§ 51–60, and thereby reflects the principles of negligence upon which the FELA is explicitly based.

The District Court granted exoneration to respondent upon findings that the accident was not attributable to negligence of any kind on its part, and in particular that respondent was not negligent in carrying the kerosene signal lantern, which ignited the fumes from the petroleum products on the surface of the river, at a height of three feet in a part of the river which had never been considered a danger area. Although the District Court found that the accident was traceable in fact to respondent's violation of a Coast Guard regulation, 33 CFR § 80.16 (h), which required a white light to be carried

at a minimum height of eight feet above the water,[1] the court held that this violation did not of itself give rise to liability in negligence because the sole purpose of the statute authorizing the regulation, 30 Stat. 102, as amended, 33 U. S. C. § 157, was to guard against collisions and not to prevent the type of accident which here resulted.

This holding, as the Court seems to recognize, was in accord with the familiar principle in the common law of negligence that injuries resulting from violations of a statutory duty do not give rise to liability unless of the kind the statute was designed to prevent. Indeed that principle, which is but an aspect of the general rule of negligence law that injuries in order to be actionable must be within the risk of harm which a defendant's conduct has created, see Seavey, Principles of Torts, 56 Harv. L. Rev. 72, 90–92 (1942), was established as long ago as 1874 by a leading English case, *Gorris* v. *Scott,* L. R. 9 Ex. 125, and has been followed in this country almost without exception. Restatement, Torts, § 286; Prosser, Torts (2d ed. 1955), § 34; Lowndes, Civil Liability Created by Criminal Legislation, 16 Minn. L. Rev. 361, 372–377 (1932); cf. *The Eugene F. Moran,* 212 U. S. 466, 476 (under admiralty law).

---

[1] This finding must rest on the assumption of the District Court that the regulation forbade respondent to carry any signal light at a height of less than eight feet above the water. However, it is questionable whether the regulation had the effect of proscribing a light at three feet, as well as requiring a light at a minimum height of eight feet. That is, the violation of the regulation may have consisted solely in the *absence* of a light eight feet above the water, not in the *presence* of a light three feet above the water, in which case the accident could not be attributed to violation of the regulation. For the purpose of this opinion, I shall assume, as the District Court necessarily concluded, that the violation of respondent consisted in carrying the light at three feet and was thus the factual cause of the accident.

The Court neither casts doubt on the District Court's finding that respondent was not negligent in carrying the tug's lantern at three feet above the water surface nor disputes that the sole purpose of the Coast Guard regulation was to guard against the risk of collision, but it nevertheless decides that violation of the regulation in and of itself rendered the respondent liable for *all* injuries flowing from it. This holding is said to follow from the decisions of this Court in a series of FELA cases based on violations of the Safety Appliance Act, 27 Stat. 531, as amended, 45 U. S. C. §§ 1–16, and the Boiler Inspection Act, 36 Stat. 913, as amended, 45 U. S. C. §§ 22–34. These decisions, as the Court here properly states, have created under the FELA an absolute liability—that is, a liability "without regard to negligence"—for injuries resulting from violations of the other Acts. From this, the Court concludes that there is no reason not to extend this absolute liability to cases based on the violation of a statutory duty which are brought under the Jones Act.

This conclusion I cannot share. A reading of the cases relied upon by the Court demonstrates beyond dispute that the reasons underlying those decisions have no application in the context of this Coast Guard regulation and the Jones Act. It follows that liability can be impressed on respondent only because of negligence, the theory upon which the Jones Act is founded.

In the course of its development of an absolute liability under the FELA for injuries traceable to violations of the Safety Appliance Act or the Boiler Inspection Act, the Court has faced two distinct problems. First, was it necessary for the plaintiff to show that the violation of either of these safety statutes was due to negligence? The answer has uniformly been "no." *St. Louis, Iron Mountain & So. R. Co.* v. *Taylor,* 210 U. S. 281; *San Antonio &*

*A. P. R. Co.* v. *Wagner,* 241 U. S. 476; *Minneapolis & St. L. R. Co.* v. *Gotschall,* 244 U. S. 66; *Southern R. Co.* v. *Lunsford,* 297 U. S. 398; *Lilly* v. *Grand Trunk R. Co.,* 317 U. S. 481. Second, was the defendant's liability for the injuries suffered limited to those within the character of the risks which these statutes were designed to eliminate? Except for *St. Louis & S. F. R. Co.* v. *Conarty,* 238 U. S. 243, which stands alone and has never since been followed, the answer here has also been "no." *Louisville & N. R. Co.* v. *Layton,* 243 U. S. 617; *Davis* v. *Wolfe,* 263 U. S. 239; *Swinson* v. *Chicago, St. P., M. & O. R. Co.,* 294 U. S. 529; *Brady* v. *Terminal Railroad Assn.,* 303 U. S. 10.

The rationale for these earlier cases is not entirely clear, but after a good deal of uncertainty it finally became established in 1948 and 1949 that railway employees suffering injuries in consequence of a violation of safety regulations found in or promulgated under 'either the Safety Appliance Act or the Boiler Inspection Act could maintain an action under the FELA *without reference* to the law of negligence. *Urie* v. *Thompson,* 337 U. S. 163; *O'Donnell* v. *Elgin, J. & E. R. Co.,* 338 U. S. 384; *Carter* v. *Atlanta & St. A. B. R. Co.,* 338 U. S. 430. As a result of these cases, the scope of § 1 of the FELA, 35 Stat. 65, as amended, 45 U. S. C. § 51, has been enlarged by making compensable not only injuries "resulting in whole or in part from the negligence" of the carrier, but also those resulting from violation of the two regulatory Acts, so that in effect these Acts give rise, through the medium of the FELA, to a "non-negligence" (*O'Donnell, supra,* at 391) cause of action. Referring to the nature of that kind of action this Court said in *Carter, supra* (at p. 434):

"Sometimes that violation [of the Safety Appliance Act] is described as 'negligence per se' . . . ; but we

have made clear in the *O'Donnell* case that that term is a confusing label for what is simply a violation of an absolute duty.

"Once the violation is established, only causal relation is in issue. And Congress has directed liability if the injury resulted 'in whole or in part' from defendant's negligence *or its violation of the Safety Appliance Act.*" (Italics added.)

These cases then certainly do not establish any broad rule under the FELA that the term *"negligence"* as used in that Act is not subject to the limiting doctrine of *Gorris* v. *Scott, supra,* which the District Court applied. Rather, they are based on a theory of liability wholly divorced from negligence. And in fact, the Court today invokes these decisions to support its conclusion that a *"non-negligence"* action based on violation of this Coast Guard regulation lies under the Jones Act. Its reasons for this conclusion are that the Jones Act "incorporates the provisions of the FELA" and "expressly provides for seamen the cause of action—and consequently the entire judicially developed doctrine of liability—granted to railroad workers by the FELA." The Court thus reads these decisions to establish a doctrine under the FELA that injuries following *any* violation of *any* statute, not simply the Safety Appliance and Boiler Inspection Acts, are actionable without any showing of negligence, and it is this doctrine which, the Court argues, the Jones Act absorbs.

So unjustifiably broad a view of the doctrine this Court is said to have established disregards the basis upon which these earlier decisions proceed. In brief, they concentrate and explicitly rest upon the peculiar relationship between the Safety Appliance and the Boiler Inspection Acts, on the one hand, and the FELA, on the other. In view of this relationship, the Court, recognizing that

neither of these safety Acts gives rise to a private cause of action of its own force, see, *e. g., Urie* v. *Thompson, supra,* at p. 188, has read the FELA to provide the private remedy to enforce the absolute liability which the Court considered the other Acts to establish. The Court's opinion here makes no effort to show either that the statute authorizing the Coast Guard regulation was intended to give rise to an absolute liability for injuries resulting from its violation or that the Jones Act, a statute founded on negligence, was intended to be the medium of enforcement of such a liability.

In the cases involving the Safety Appliance and the Boiler Inspection Acts, the Court has repeatedly emphasized that the manifest purpose of Congress was to foster through these particular Acts the safety of employees and to make employees secure in their jobs, a purpose partially evidenced by statements prefacing each of these Acts as they were originally enacted: "An Act to promote the safety of employees and travelers upon railroads by compelling common carriers engaged in interstate commerce to . . ." follow the rules of each Act. 27 Stat. 531; 36 Stat. 913; *Illinois Central R. Co.* v. *Williams,* 242 U. S. 462, 466–467; *Urie* v. *Thompson, supra,* at 190–191. In keeping with this statement of purpose, two sections of the Safety Appliance Act expressly refer to the civil liability of employers to injured employees by abrogating the common-law defense of assumption of risk and by preserving such civil liability over a particular exception to the general liability for fines payable to the United States which is imposed on carriers for violation of the provisions of the Act. 27 Stat. 532, 45 U. S. C. § 7; 36 Stat. 299, 45 U. S. C. § 13.

Paralleling the provision of the Safety Appliance Act referring to assumption of risk is § 4 of the FELA, 35 Stat. 66, as amended, 45 U. S. C. § 54, which abolishes

the defense of assumption of risk not only with respect to actions grounded on negligence but also "in any case where the violation . . . of any statute enacted for the safety of employees contributed to the injury or death of" an employee. This quoted clause is included also in § 3 of the Act, 35 Stat. 66, 45 U. S. C. § 53, which substitutes for the absolute common-law defense of contributory negligence what is in effect a rule of comparative negligence, but bars this defense completely in actions based on the violation of such a statute. The phrase "any statute enacted for the safety of employees" of course refers to the Safety Appliance Act, *Moore* v. *Chesapeake & Ohio R. Co.,* 291 U. S. 205, 210, and to the Boiler Inspection Act, *Urie* v. *Thompson, supra,* at 188–189. The use of this phrase in juxtaposition with the term "negligence" in these sections confirms the congressional purpose to accord special treatment to employees injured by violations of these Acts.

These express indications of congressional intent to impose strict liability for injuries traceable to violations of these statutes underlay the holdings on which the Court relies. The intimate relationship between the Safety Appliance Act and the FELA was summed up by the Court in *San Antonio & A. P. R. Co.* v. *Wagner, supra,* in the following language (p. 484):

> "If [the Safety Appliance Act] is violated, the question of negligence in the general sense of want of care is immaterial. . . . [T]he two statutes [Safety Appliance Act and the FELA] are *in pari materia,* and where the [FELA] refers to 'any defect or insufficiency, *due to its negligence,* in its cars, engines, appliances,' etc., it clearly is the legislative intent to treat a violation of the Safety Appliance Act as 'negligence' . . . ." (Italics in original.)

And in *Urie* v. *Thompson, supra,* the Court concluded (p. 189):

"In this view the Safety Appliance Acts, together with the Boiler Inspection Act, are substantively if not in form amendments to the [FELA]. . . . [They] cannot be regarded as statutes wholly separate from and independent of the [FELA]. They are rather supplemental to it, having the purpose and effect of facilitating employee recovery . . . ."

Finally, as noted above, the Court in *Carter* v. *Atlanta & St. A. B. R. Co., supra,* at 434, observed that "Congress has directed liability" under the FELA for injuries resulting from negligence *or* from violation of these Acts.

In short, I think it is evident that this Court's past interpretation of the FELA to provide a cause of action based on absolute liability for injuries traceable to violations of these two *particular* safety statutes has rested entirely on its view of congressional intent, and that no general rule of absolute liability without regard to negligence for injuries resulting from violation of *any* statute can fairly be said to emerge from these decisions.

Despite the explanations in the past cases for creation of this absolute liability, the Court now asserts that "the nature of the Acts violated is not a controlling consideration." Indeed, it does not even appear to be a pertinent consideration, for the opinion makes no effort to show that a similar congressional intent to create absolute liability in favor of seamen, or even to afford additional rights to seamen, can be discerned either in the terms of the statute authorizing this Coast Guard regulation or in its relationship with the Jones Act. It is abundantly clear from the face of the regulation, and its setting, that its purpose was simply to prevent collisions, rather than to guard against such unforeseeable occurrences as the

explosion in this case.[2]   This is confirmed by the tenor of the section of the statute under which the regulation issued:

> "The Commandant of the United States Coast Guard shall establish such rules to be observed on the waters mentioned in the preceding section by steam vessels in passing each other and as to the lights to be carried on such waters by ferryboats and by vessels and craft of all types when in tow of steam vessels . . . as he from time to time may deem necessary for safety . . . ."[3]

Moreover, although another section of the same statute indicates that violation of this regulation does give rise to an absolute liability on the part of the *master* or *mate*

---

[2] The particular regulation violated by respondent, 33 CFR § 80.16 (h), appears under Subchapter D of 33 CFR, which is entitled: "Navigation Requirements For Certain Inland Waters." Section 80.16 itself bears the caption: "Lights for barges, canal boats, scows and other nondescript vessels on certain inland waters on the Atlantic and Pacific Coasts." Other sections under Subchapter D regulate fog signals (§ 80.12), speed in fog (§ 80.13), and navigation near bends and curves (§ 80.5). Section 80.16 (h) itself states that a light shall be carried at a minimum height of eight feet above the surface of the water ". . . and shall be so placed as to show an unbroken light all around the horizon, and shall be of such a character as to be visible on a dark night with a clear atmosphere at a distance of at least 5 miles."

[3] This section, 30 Stat. 102, as amended, 33 U. S. C. § 157, appears under Chapter 3 of Title 33, which bears the title: "Navigation Rules for Harbors, Rivers, And Inland Waters Generally." Other sections under Chapter 3 refer to sound signals (33 U. S. C. § 191), speed in fog (33 U. S. C. § 192), and ascertainment of risk of collision (33 U. S. C. § 201). Section 157 was originally enacted as part of the Act of June 7, 1897, and the clear purpose of that Act was simply to effect a codification of all rules governing navigation on inland waters so that they would conform in the highest possible degree to prevailing international rules for the prevention of collisions at sea. H. R. Doc. No. 42, 55th Cong., 1st Sess., p. 1.

of the tug for damages suffered by *passengers*, that section makes no reference to *seamen's* remedies and provides generally that liability of the *vessel* or *owner* is not to be affected by the statute.[4]   Finally, there are no cross provisions between this statute and the sections of the FELA incorporated into the Jones Act comparable to those found between the FELA, on the one hand, and the Safety Appliance and Boiler Inspection Acts, on the other.   In short, unlike the situation as to those statutes, one can look in vain for evidence of a congressional purpose to supplement the remedies for injuries due to negli-

---

[4] 30 Stat. 102, as amended, 33 U. S. C. § 158, was also enacted as part of the Act of June 7, 1897, note 3, *supra*.   It provides in part that: "Every pilot, engineer, mate, or master of any steam vessel . . . and every master or mate of any barge or canal boat, who neglects or refuses to observe the provisions of . . . the regulations established in pursuance of [§ 157, text at note 3, *supra*] . . . shall be liable to a penalty of one hundred dollars, and for all damages sustained by any passenger in his person or baggage by such neglect or refusal: *Provided,* That nothing herein shall relieve any vessel, owner, or corporation from any liability incurred by reason of such neglect or refusal."   As originally drafted, preceding its enactment in 1897, present § 158 read substantially as it does now, except that it did not contain the last *"Provided"* clause.   H. R. Doc. No. 42, 55th Cong., 1st Sess., p. 9.   In the House debates concerning the Act of 1897, discussion was directed in part to this section and the question was raised whether its effect might be to impose liability for injury to passengers exclusively upon *officers* of the vessels, who might be financially irresponsible.   30 Cong. Rec. 1395.   To end these doubts, the section was amended prior to its enactment by addition of the *"Provided"* clause.   Representative Payne stated that the amendment's purpose was to make clear that liability of the *vessel* or *owner of the vessel* for damages would remain entirely unaffected by the section.   30 Cong. Rec. 1465.   In other words, the Act of 1897 was not intended either to define to any extent liability of a vessel or its owner or to advance the remedies or broaden the rights of seamen, but simply afforded *passengers* remedies against officers *personally* liable because of breach of regulations.

gence available to seamen under the Jones Act by a cause of action based on absolute liability for damages suffered in consequence of a violation of this Coast Guard regulation. In these circumstances, the argument that such a cause of action arises because the Jones Act "expressly provides for seamen the cause of action . . . granted to railroad workers by the FELA" seems to me an empty one.

The premise of the Court that the FELA was intended to leave to federal courts the duty of fashioning remedies "to meet . . . changing concepts of industry's duty toward its workers" underlies today's holding. In carrying out this duty, the courts, as shown by this decision, are not to consider themselves confined by doctrines deeply ingrained in the common law of negligence upon which the FELA was predicated but instead are to be free to develop other theories of liability. Indeed, not content with its particular conclusion that violation of a statutory duty leads to absolute liability under the FELA and the Jones Act, the Court goes on to say that "the theory of the FELA is that where the employer's conduct falls short of the high standard required of him by this Act, and his fault, in whole or in part, causes injury, liability ensues . . . whether the fault is a violation of a statutory duty or the more general duty of acting with care . . . ." Thus the Court in effect reads out of the FELA and the Jones Act the common-law concepts of foreseeability and risk of harm which lie at the very core of negligence liability, and treats these statutes as making employers in this area virtual insurers of the safety of their employees.

Whatever may be one's views of the adequacy of "negligence" liability as the means of dealing with occupational hazards in these fields, Congress has not legis-

lated in terms of absolute liability. "The basis of liability under the Act is and remains negligence." *Wilkerson* v. *McCarthy,* 336 U. S. 53, 69 (concurring opinion of DOUGLAS, J.). And, except as expressly modified by Congress, the term "negligence" as it appears in § 1 of the FELA has always been taken to embody common-law concepts. Thus in *Urie* v. *Thompson, supra,* one of the principal cases on which the Court here relies, it was said (at 174, 182):

> "The section [§ 1 of the FELA] does not define negligence, leaving that question to be determined . . . 'by the common law principles as established and applied in the federal courts.' . . .
>
> "We recognize . . . that the Federal Employers' Liability Act is founded on common-law concepts of negligence and injury, subject to such qualifications as Congress has imported into those terms." [5]

I cannot agree that Congress intended the federal courts to roam at large in devising new bases of liability to replace the liability for negligence which these Acts imposed on employers.

I would affirm.

---

[5] The qualifications of course refer to those provisions of the FELA not applicable to the facts of this case which modify or abrogate the common-law defenses of contributory negligence, § 3, 35 Stat. 66, 45 U. S. C. § 53, and assumption of risk, § 4, 35 Stat. 66, as amended, 45 U. S. C. § 54.