William P. ELLIOTT, Yoaman L. Smith, and Mark J. Anderson, Plaintiffs,

v.

UNION PACIFIC RAILROAD COMPANY, a Utah corporation, Defendant.

Civ. A. Nos. 93-K-600, 93-K-601 and 94-K-1122.

United States District Court, D. Colorado.

Sept. 7, 1994.

Roger R. Roe, Jr., Yaeger, Jungbauer, Barczak and Roe, Minneapolis, MN, Brian J. Berardini, Brown & Berardini, Denver, CO, for plaintiffs.

Mark C. Hansen, Denver, CO, for defendant.

## MEMORANDUM OPINION AND ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

KANE, Senior District Judge.

These consolidated Federal Employers' Liability Act (FELA) cases arise out of an August 13, 1991 leak of anhydrous ammonia vapor near a hog-loading facility in Gibbon, Nebraska. Plaintiff employees of Union Pacific Railroad Company (Union Pacific) claim they were exposed to the ammonia while serving as crewmembers on a westbound Union Pacific train sent to Gibbon to pick up hogs, and claim they suffered severe and disabling respiratory and other injuries as a result. Plaintiffs assert Union Pacific was negligent in failing to investigate a reported ammonia leak in Gibbon that evening and in failing to warn plaintiffs of the potential danger.

Plaintiffs seek entry of summary judgment in their favor on the issues of liability and causation. They submit affidavits and other evidence indicating Union Pacific received a radio communication regarding a potential anhydrous ammonia leak at Gibbon on the evening in question; the caller asked Union Pacific to investigate; and Union Pacific not only failed to investigate the report, but dispatched plaintiffs' train to Gibbon where plaintiffs were exposed to toxic anhydrous ammonia vapors.

Union Pacific's response on the issue of liability is somewhat confusing. On the one hand, Union Pacific admits its dispatcher Rick Weisgerber received a report of a "slight odor" of anhydrous ammonia in Gibbon on the evening of August 13th before plaintiffs' train was dispatched there and admits Weisgerber was asked to "have someone investigate" the source of the odor, but argues the odor reported was of "insufficient volume and/or intensity" to constitute a "potential" hazard to employees. Thus, Union Pacific argues, there is a material issue of fact as to whether it had reasonable notice of a potential hazard in Gibbon that evening precluding entry of summary judgment. On the other hand, dispatcher Weisgerber states he has been trained and it is his practice to contact his Corridor Manager (who would then contact police) if he received a request

to investigate a matter "such as ... the source of a slight anhydrous ammonia odor," but concedes he did not do so until after plaintiffs' train was sent to Gibbon. The first argument requires reading the word "potential" out of "potential hazard" and is specious; it is also unsupported by caselaw. The second is, by itself, an admission of negligence.

With respect to causation, Union Pacific offers no evidence to rebut the medical reports submitted by plaintiffs indicating they suffer from reactive airways dysfunction (RADS) consistent with acute ammonia exposure. Instead it argues plaintiffs were contributorily negligent and "solely responsible" for their injuries because they violated Union Pacific's safety rules by failing to evacuate the area on foot when they noticed the ammonia odor, and instead waited for the tracks to clear so they could leave on their locomotive. Because nothing short of 100% negligence on the part of plaintiffs would bar recovery, this argument, too, is specious.

## I. *Facts*

Plaintiffs claim that on the evening of August 13, 1991, at approximately 8:04 p.m., an eastbound Union Pacific train arrived in Gibbon, Nebraska. Pls.' Br.Supp.Mot.Summ.J. at 1–2. Through the deposition and affidavit testimony of certain eastbound train crew members, plaintiffs allege the odor of anhydrous ammonia was first detected at approximately 8:30 p.m. *Id.* at 2. Eastbound train conductor Timothy Bourke contacted engineer Al Kleinkauf, who testified he "immediately" contacted Union Pacific dispatcher Rick Weisgerber. *Id.* Kleinkauf testified he told Weisgerber "there was an anhydrous leak in the vicinity of the east crossing at Gibbon ... just west of the hog loading facility," that it was "bothersome" to his crew, and that the crew had to "get out of there." Kleinkauf Dep. (Ex. B to Pls.' Br. Supp.Mot.Summ.J.) at 12:17–21, 13:24—14:2.

Plaintiffs William P. Elliott, Patrick C. Hagedorn, and Yoaman L. Smith were part of a crew on a westbound train travelling from Grand Island to North Platte, Nebraska on August 13, 1991. They received a work order to pick up a load of hogs at Gibbon, and were permitted to enter the area

at 9:12 p.m. Just before 9:13 p.m., Weisgerber apparently notified Corridor Manager Richard Erben of the communication from Kleinkauf, and at 9:13 p.m., Erben contacted the Buffalo County Sheriff's Department.

While the crew of the westbound train had been in contact with dispatcher Weisberger between 8:30 and 9:12 p.m., they were not apprised of the communication from Kleinkauf, the communication with Erben, or of a potential anhydrous ammonia leak at Gibbon. Pls.' Br.Supp.Mot.Summ.J. at 3. Shortly after their arrival, westbound train crew members noticed a strong odor of anhydrous ammonia, and westbound train conductor Anderson notified Weisberger. *Id.* Anderson's undisputed testimony was that the crew had to "clear some trains" before their train could leave, and that the crew was exposed to the ammonia vapor for approximately 20 minutes as a result. Anderson Dep. (Ex. F Pls.' Br.Supp.Mot.Summ.J.) at 20:3, 19:24.

Other than the detail and urgency of the report from Kleinkauf, Union Pacific disputes little of the westbound train crew's testimony. Union Pacific dispatcher Rick Weisgerber initially had no direct recollection of what Kleinkauf told him or why he decided not to investigate the odor immediately as Kleinkauf requested. *See* Weisgerber Dep. (Ex. C to Pls.' Br.Supp.Mot.Summ.J.) at 41:15–19 (only "vague recollection of the ammonia leak being reported"), 49:15—50:7 (Weisgerber does not recall the sequence of events that evening or his communication with Erben). In his affidavit, however, Weisgerber recalls some details and infers others.

In his affidavit, Weisgerber admits Kleinkauf contacted him by radio between 7:00 and 10:00 p.m., but states Kleinkauf merely notified him of "slight odor of anhydrous ammonia." Weisgerber Aff. (Ex. A Resp. Pls.' Br.Supp.Mot.Summ.J.) at ¶ 4. Weisgerber states Kleinkauf asked him to "have someone investigate the source of the odor," but infers he failed to contact or delayed contacting his Corridor Manager because Kleinkauf did not inform him the ammonia odor "was of sufficient volume and/or intensity so as to create an unsafe condition for his train crew or other crews coming into the

area." [1] *Id.* Assuming, *arguendo,* Weisgerber's inference is justified, it is contradicted by Weisgerber himself later in his affidavit, where he states it was his "habit and custom" to contact his Corridor Manager and notify nearby trains if he was "made aware" of either an "unusual circumstance *or* [a] slight anhydrous ammonia odor" in his territory. Weisgerber Aff. at ¶ 8 (emphasis added). Because Weisgerber admits in paragraph 4 of his affidavit that he *was* made aware of a "slight anhydrous ammonia odor" before he dispatched plaintiffs' train to Gibbon, Weisgerber by his own testimony violated a standard of care.

Union Pacific does not deny either that Weisgerber dispatched plaintiffs' train to Gibbon after he received Kleinkauf's 8:35 communication; that plaintiffs were not notified of Kleinkauf's call or warned of a potential ammonia leak near Gibbon; or that there was anhydrous ammonia leaking at or near the Gibbon facility after plaintiffs' train arrived at 9:12 p.m. Under these circumstances, Weisgerber admits it "would have been a mistake" to let plaintiffs' train enter Gibbon. Weisgerber Dep. at 50:12–16; *see* Erben Dep. at 46:5—47:10 (trains should be held "until we get some feedback of the nature of the event that is transpiring, is there a hazard involved or not").

As justification, Weisgerber and Union Pacific simply state they were not aware there "may" have been a "potential hazard or risk of danger" to Union Pacific employees until

45 minutes after Kleinkauf's communication when Weisgerber received a call from the conductor of plaintiffs' train, Mark Anderson, stating plaintiffs had been exposed to anhydrous ammonia vapor. *See* Def.'s Resp. Mot.Summ.J. at 5; Weisgerber Aff. at ¶ 4.

### II. *Merits*

The Federal Employers' Liability Act makes a common carrier "liable in damages to any person suffering injury while he is employed by such carrier in such commerce ... resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier." 45 U.S.C. § 51 *et seq.* The general language of FELA leaves in large measure to the courts the duty of fashioning remedies for injured employees. Thus, courts have looked to common law negligence actions to determine the scope of employers' liability under the act. *See generally Kernan v. American Dredging Co.,* 355 U.S. 426, 431, 78 S.Ct. 394, 397, 2 L.Ed.2d 382 (1958).

While the elements of a FELA negligence action are commonly the same as those necessary to a common law negligence action, an industrial employer is held to a higher standard of care than persons generally. *Kernan,* 355 U.S. at 431, 78 S.Ct. at 397 (industrial employers have "special responsibility" toward workers). FELA is to the railroad industry what worker's compensation statutes are to other industries. *Id.* at 431–32, 78 S.Ct. at 397–398. As the United

---

1. Weisgerber supports his inference through "habit and custom" testimony. Weisgerber states it is his "habit and custom" to contact his Corridor Manager and notify all Union Pacific trains nearby upon being advised of an "unusual circumstance." He states an "unusual circumstance" would include an anhydrous ammonia leak "of sufficient volume and/or intensity," but "would not necessarily include a slight odor of anhydrous ammonia." *Id.* at ¶ 5. In a stunning demonstration of *post hoc, ergo propter hoc* reasoning, Weisgerber opines that because he did not notify his Corridor Manager after Kleinkauf's call, "it is [his] belief that [he] was not notified of a possible anhydrous ammonia leak of sufficient volume and/or intensity in Gibbon on August 13, 1991" to constitute an unusual circumstance. *Id.* at ¶¶ 6–8.

This is not proper "habit and custom" evidence under Fed.R.Evid. 406. The Notes of Advisory Committee to Rule 406 define "habit" as "one's

regular response to a repeated specific situation." The Advisory Committee expressly distinguishes "habit" from "character." Only the former is admissible as proof the conduct of the person on a particular occasion conformed with that person's conduct in general. Where, as here, the "habit" to which a person or organization attests is the general "habit" of following safety procedures (i.e., being non-negligent), it is not proper evidence under Rule 406.

Weisberger's surmise that the ammonia odor reported to him must have been of an insufficient volume or intensity to constitute a potential hazard, even if admissible, does not create a question of fact as to liability in this case. The "volume and/or intensity" of a reported ammonia odor does not matter in determining whether it constitutes a *potential* hazard. If ammonia is a hazardous substance (and Union Pacific admits it is) *any* odor of it is a "potential" hazard.

States Supreme Court has consistently interpreted it, the general congressional intent in enacting FELA was to provide "liberal recovery" for injured workers. *Id.* at 432, 78 S.Ct. at 398, *citing Rogers v. Missouri Pacific R. Co.,* 352 U.S. 500, 508–510, 77 S.Ct. 443, 449–451, 1 L.Ed.2d 493 (1957).

■■■ Thus, under FELA, a railroad will be liable if its negligence played any part, *even the slightest,* in producing an employee's injury. *Rogers, supra,* 352 U.S. at 506, 77 S.Ct. at 448. Jury verdicts in favor of a plaintiff in a FELA action can be sustained upon evidence that would not support such a verdict in an ordinary tort action. *See Cailouette v. Baltimore & Ohio Chicago Terminal R.R. Co.,* 705 F.2d 243, 246 (7th Cir.1983) (employee's contributory negligence no bar to relief).

■■■ An employer's duty to provide a safe workplace for employees "becomes more imperative as the risk increases." *Blair v. Baltimore & O.R. Co.,* 323 U.S. 600, 604, 65 S.Ct. 545, 547, 89 L.Ed. 490 (1945) (internal quotes and citations omitted). An employer breaches this duty when it knows or should know of a potential hazard in the workplace, yet fails to exercise reasonable care to inform and protect its employees. *See Gallose v. Long Island R. Co.,* 878 F.2d 80, 84–85 (2d Cir.1989), *citing DeChico v. Metro–North Commuter R.R.,* 758 F.2d 856, 862 (2d Cir. 1985) (employer fails to deal with hazardous accumulations of ice and snow at workplace); *Lindauer v. New York Central R.R. Co.,* 408 F.2d 638, 640 (2d Cir.1969) (employer negligent in failing to take any protective measure for employees it knew would be subject to prolonged exposure to cold).

> Th[e] duty [to inform and protect] is ongoing; 'an employer's otherwise reasonable conduct may become unreasonable if the employer, after being informed that a condition is potentially dangerous, fails to investigate' and, if necessary, correct the problem.

*Gallose, supra,* 878 F.2d at 85, *quoting Mohn v. Marla Marie, Inc.,* 625 F.2d 900, 902 (9th Cir.1980).

■■■ The catalyst that ignites the duty to investigate and correct is knowledge, either actual or constructive. *Gallose* at 85, *citing Schilling v. Delaware & H.R. Corp.,* 114 F.2d 69, 71 (2d Cir.1940). Thus, an employer is not liable if it has no reasonable way of knowing a potential hazard exists. *Id.* However, if an employer learns or should learn of a potential hazard, it must take reasonable steps to investigate and to inform and protect its employees, or it will be liable when injury occurs. *Id.*

■■■ Union Pacific admits it knew of a "slight odor of anhydrous ammonia" in Gibbon on the evening in question and admits it was asked to investigate the source of that odor. Union Pacific attempts to avoid summary judgment by creating a factual issue around the question of whether this knowledge constituted notice of a "potential hazard" to employees in the area of the odor. Resp.Mot.Summ.J. at 6. Union Pacific argues a reported ammonia odor must be of "sufficient volume and/or intensity" before it constitutes a "potential hazard," and argues Kleinkauf's 8:35 p.m. radio communication to Weisgerber did not rise to that level. This is nonsense.[2] If anhydrous ammonia vapor in "sufficient" quantities is a hazard, then an odor of anhydrous ammonia in any quantity is a "potential" hazard. Moreover, the undisputed testimony is that Kleinkauf told Weisgerber the ammonia leak was "bothersome" to his crew and they "had to get out of there."

Union Pacific relies heavily on the case of *Peyton v. St. Louis Southwestern Ry. Co.,* 962 F.2d 832 (8th Cir.1992) to argue the question of whether the report of a "slight odor of ammonia" constituted "notice of a potential hazard" is one for the jury. Resp. Mot.Summ.J. at 4. *Peyton,* a defective tool case, is wholly inapposite. In *Peyton,* plain-

**2.** The vacuity of Union Pacific's argument is evident in its statement on page 5 of its response that "it was not until later when Mr. Weisgerber received a radio call from [the] conductor working with plaintiffs on the night of August 13, 1991, that [he] learned there *may* be a *potential* hazard or risk to the Union Pacific employees in Gibbon, Nebraska." (Emphasis added.) By the time the ammonia odor was of "sufficient volume and/or intensity" to constitute a "potential" hazard in the eyes of Union Pacific, several employees had been exposed and injured.

tiff argued his employer should have inspected the wrench he was using for hidden stress cracks before allowing him to use it. 962 F.2d at 834. The employer had received no notice the wrench may have been defective and the employee failed to show how the defect that caused the wrench to fracture could have been detected even if the employer had inspected it. *Id.* Under those circumstances, the Eighth Circuit concluded the employer had no reasonable way of knowing about the hazard that caused the employee's injury and affirmed the trial court's entry of judgment in favor of the employer notwithstanding the verdict. In the case at bar, where the employer admits receiving notice of a potential hazard before a plaintiff's injury occurs, *Peyton* is inapplicable.

### III. *Conclusion*

The only reasonable conclusions that can be drawn from the facts of this case are (1) Union Pacific's dispatcher received notice of a potential leak of anhydrous ammonia but failed to notify plaintiffs' train; or (2) it is Union Pacific's practice not to investigate reports of potential leaks of hazardous substances until those leaks are of sufficient volume and/or intensity to constitute a danger to employees. In either event the railroad was negligent as a matter of law.

Plaintiffs' motion for partial summary judgment is GRANTED.