# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2005-CA-00388-SCT

*ILLINOIS CENTRAL RAILROAD COMPANY*

*v.*

*PHILLIP ACUFF, CHARLES W. BROWN, WILLIAM
CARLISLE, JAMES M. CARPENTER, LAMAR
CLARK, C. H. COBB, HUBERT DEER, WILLIAM R.
JOHNSTON, DAN C. JONES, CLYTHUS MASON,
CHARLIE E. McNEIL, JOHNNY W. MITCHELL,
YORK SIT, CHARLES R. WARREN, LESTER RAY
WARREN, AND WILLIE WOODBERRY*

*and*

*JAMES EXPOSE*

*v.*

*ILLINOIS CENTRAL RAILROAD COMPANY*

| | |
|---|---|
| DATE OF JUDGMENT: | 12/06/2004 |
| TRIAL JUDGE: | HON. LAMAR PICKARD |
| COURT FROM WHICH APPEALED: | JEFFERSON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | LONNIE D. BAILEY |
| | GLENN F. BECKHAM |
| | THOMAS R. PETERS |
| | EDWARD BLACKMON, JR. |
| ATTORNEYS FOR APPELLEES: | THOMAS W. BROCK |
| | WILLIAM S. GUY |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | AFFIRMED ON DIRECT APPEAL AND CROSS-APPEAL - 08/03/2006 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WALLER, P.J., EASLEY AND DICKINSON, JJ.**

**DICKINSON, JUSTICE, FOR THE COURT:**

¶1. This appeal and cross-appeal arise from the circuit court's denial of a railroad company's motion to dismiss its employees' asbestos-related injury claims and the court's subsequent order enforcing the settlement agreement between the parties. The railroad argues the circuit court erred by not dismissing the employees' claims based on their submission of false affidavits, the execution of prior releases covering the asbestos-related injury claims, the expiration of the statute of limitations, and the discovery of medical information showing certain employees did not suffer from asbestos-related diseases when they filed their claims. The cross-appeal arises from the circuit court's denial of one plaintiff's asbestos-injury claim based on his execution of a prior release.

## BACKGROUND FACTS AND PROCEEDINGS

¶2. This case was originally filed in the Circuit Court of Jefferson County, Mississippi, on April 2, 2001, as *Elbert Eakins, et al. v. Illinois Central Railroad Company* ("*Eakins*"), under the Federal Employers Liability Act ("FELA"), 45 U.S.C. §§ 51 et seq. The employees are 17 of the 175 *Eakins* plaintiffs who allege they contracted diseases as a result of their exposure to asbestos while employed with Illinois Central Railroad Company ("ICRR"). On August 6, 2002, the parties agreed to a Settlement Procedure under which the *Eakins* plaintiffs, including Appellees, would be paid[1] after submitting certain information to ICRR, including the "Illinois

---

[1] In light of the Settlement Procedure, the circuit court entered an order of dismissal. All claims that had been settled and released as of the date of the order were dismissed with prejudice. Claims unsettled as of that date were dismissed without prejudice with the circuit court reserving the right to re-docket those claims.

Central Pulmonary Questionnaire," employment and healthcare information, and certain medical records. Upon receipt of sufficient documentation, ICRR was to pay each plaintiff a predetermined amount based on the illness attributable to asbestos exposure and employment with ICRR.

¶3. Although ICRR paid a number of claims pursuant to this process, the *Eakins* plaintiffs filed a Motion to Enforce the Settlement Agreement on June 19, 2003, due to a lag in many payments. Soon after, ICRR voiced concerns about the documentation provided by some of the plaintiffs. One plaintiff, Fred Taylor, had submitted inaccurate and incomplete answers to a question about prior litigation in his Pulmonary Questionnaire, and ICRR learned he had been diagnosed with an asbestos-related illness more than three years before *Eakins* was filed. He was later dismissed voluntarily based on ICRR's statute of limitations defense.

¶4. On March 29, 2004, the *Eakins* plaintiffs' counsel offered to provide ICRR with affidavits from all remaining unsettled plaintiffs detailing their involvement in prior asbestos litigation. After ICRR received the supplemental documentation, it discovered that most of the affidavits, including those from the employees here, omitted the affiant's involvement in at least one additional asbestos case. ICRR moved to compel compliance and for related relief.

¶5. Circuit Judge Lamar Pickard conducted hearings on the settlement issues on June 21, August 2, and October 15, 2004. Both ICRR and the employees agreed to have Judge Pickard determine all issues of both law and fact. ICRR asserted the inaccurate affidavits required dismissal of the employees' actions, prior releases barred thirteen employees' asbestos-injury

claims,[2] the statute of limitations had run on two employees, and subsequent tests performed on three employees invalidated their claims.

¶6.	The circuit court ruled the inaccurate information in the affidavits did not prejudice ICRR, and even if the omitted information had been included, that information would not have aided ICRR in any of its defenses. The court also found the prior releases did not bar any of the plaintiffs' claims, the statute of limitations had not run on plaintiffs Hubert Deer and Willie Mobley, and subsequent medical tests did not bar the claims of plaintiffs Charles McNeil, Lester Warren, and Willie Woodberry.

¶7.	On December 6, 2004, the circuit court entered an order granting Plaintiffs' Motion to Enforce Settlement Agreement and denying ICRR's Motion to Compel Compliance with March 29, 2004 Agreement and Supplement and to Dismiss Certain Claims. The court also certified the order as a final judgment pursuant to M.R.C.P. 54(b). Based, in part, on newly-discovered evidence allegedly showing the intentional nature of the employees' affidavit omissions, ICRR requested reconsideration of the order. After a hearing, the circuit court denied ICRR's Motion to Reconsider by order dated January 28, 2005.

¶8.	ICRR timely filed its notice of appeal and plaintiff James Expose appealed from the dismissal of his claim based on a prior release.

### ISSUES ON APPEAL/CROSS-APPEAL

¶9.	ICRR presents five issues for this Court's consideration on appeal:

I.	Whether the circuit court erred when it granted the plaintiffs' motion to enforce the settlement agreement and failed to dismiss the plaintiffs'

---

[2] The circuit court did dismiss the claim of James Expose based on a prior release which covered his pending asbestos suit. Expose's cross-appeal from this dismissal is discussed *infra*.

4

claims because of the plaintiffs' submission of false affidavits and sworn Pulmonary Questionnaires.

II. Alternatively, whether the circuit court erred when it refused to reconsider its December 6, 2004, Order based on newly-discovered evidence.

III. Alternatively, whether the circuit court erred when it failed to dismiss the claims of certain plaintiffs who had previously released their claims against ICRR.

IV. Alternatively, whether the circuit court erred when it failed to dismiss the claims of certain plaintiffs that are barred by the three-year FELA statute of limitations.

V. Alternatively, whether the circuit court erred when it failed to dismiss the claims of certain plaintiffs who had medical tests subsequent to their asbestos-screening which demonstrated they suffered no asbestos-related illnesses.

¶10. On cross-appeal, plaintiff James Expose presents one issue for our consideration: Whether the circuit court erred in ruling that his carpal tunnel release, signed while this asbestos claim was pending, also released his asbestos injury claim.

**STANDARD OF REVIEW**

¶11. In the proceedings below, both ICRR and the employees agreed to have Judge Pickard determine all issues of both law and fact. "'A circuit judge sitting without a jury is accorded the same deference with regard to his findings as a chancellor,' and his findings are safe on appeal where they are supported by substantial, credible, and reasonable evidence." *City of Jackson v. Perry*, 764 So. 2d 373, 376 (Miss. 2000) (quoting *Puckett v. Stuckey*, 633 So. 2d 978, 982 (Miss. 1993)). We may not disturb Judge Pickard's findings unless he was clearly erroneous or abused his discretion. *Howard v. Totalfina E & P USA, Inc.*, 899 So. 2d 882,

5

888 (Miss. 2005). We employ de novo review for questions of law. *Maldonado v. Kelly*, 768 So. 2d 906, 908 (Miss. 2000).

## DISCUSSION

### I.   Plaintiffs' Motion to Enforce the Settlement Agreement and ICRR's Motion to Dismiss

¶12.   ICRR argues the circuit court committed reversible error by granting the plaintiffs' motion to enforce the settlement agreement in light of false affidavits and questionnaires submitted by the plaintiffs. Plaintiffs assert the omissions were inadvertent, inconsequential, and did not prejudice ICRR.

*August 2, 2002, Settlement Procedure*

¶13.   The Settlement Procedure required the *Eakins* plaintiffs to submit information to ICRR for its review before payments could be made. This included the "Illinois Central Pulmonary Questionnaire," a sworn document requesting information on the plaintiff's employment, medical, and litigation history. The "Litigation" section asked about claims filed against ICRR or any asbestos manufacturer. During pre-settlement discussions, the plaintiffs voiced concerns about the questionnaire, but ICRR told them to do the best they could filling out the forms, as "this would be sufficient."

¶14.   ICRR's purpose in obtaining the information on the questionnaire was to verify the claimed disease, confirm employment with ICRR, identify statute of limitations issues, and determine any defenses raised by prior releases. At one point, the agreement explained ICRR could raise defenses "as to length of employment, questions regarding prior releases, questions raised regarding the statute of limitations, or other issues not currently envisioned

6

by the parties." When specifically addressing potential defenses, the agreement noted, "where information is developed that a particular plaintiff's case may be barred by reason of a statute of limitations issue, by reason of a prior release, or failure to establish the plaintiff as an employee of [ICRR]," and ICRR could reject such cases, pending negotiation. The next paragraph repeated these three defenses.

*April 22, 2004, Supplemental Agreement*

¶15. Many claims were settled pursuant to the Settlement Procedure, but ICRR discovered a problem with some plaintiffs' answers in the "Litigation" section of the questionnaire. Specifically, ICRR learned that Fred Taylor was also a plaintiff in an unreported case, *Cosey v. E. D. Bullard*, and that he had been diagnosed with an asbestos-related disease in 1995.

¶16. When confronted with ICRR's concerns about plaintiffs failing to disclose their involvement in other asbestos lawsuits, plaintiffs' counsel offered to provide affidavits from the remaining plaintiffs concerning their involvement in prior asbestos litigation. This Supplemental Agreement specifically stated, "we will be supplying affidavits from all remaining unpaid *Allen* and *Eakins* plaintiffs regarding all **prior** asbestos litigation. If a plaintiff has been involved in **prior** litigation, we will provide you with any document that we can obtain for your review." (Emphasis added). The affidavits provided to ICRR stated, "I have never been a plaintiff or a claimant in any asbestos suit other than *Eakins v. ICRR*, No. 2001-65, in the Circuit County of Jefferson County, Mississippi and [name of other suit]." After receiving these affidavits, ICRR discovered the Appellees were also plaintiffs in one or both of the following unreported cases against asbestos suppliers or manufacturers: *McNeil v. Dresser Industries, Inc.*, No. 2002-283-CV9 ("*Dresser*"), and *Phillip Acuff v. American*

7

*Optical Corp., et al.*, No. 2003-159-CV8 ("*American Optical*"). Plaintiffs assert their failure to mention these cases was inadvertent.

*Unintentional Omissions*

¶17. At the October 15, 2004, hearing, Judge Pickard ruled that the omission of the two subsequent asbestos suits was inadvertent and not willful. Judge Pickard was at least partially persuaded by the fact that, even if these cases had been disclosed, such disclosure would not have assisted ICRR in any of its defenses against the plaintiffs.

¶18. Plaintiffs' counsel admitted to the circuit court that he failed to include the *Dresser* and *American Optical* lawsuits, saying, "[i]t was totally inadvertent. It was my fault." Apologizing for the inaccuracies, counsel assured the court that no plaintiff intentionally withheld information from ICRR and admitted that he did not consider *Dresser* and *American Optical* to be relevant under the Supplemental Agreement. Plaintiffs explain in their brief that both *Dresser* and *American Optical* are

> pre-pack bankruptcy cases where in order to file a claim in the bankruptcy, a lawsuit had to be filed. Thus *Dresser* and *American Optical* were both filed as technical requirements in order to file a bankruptcy claim. There was never any active litigation in *Dresser* or *American Optical* as to [the Appellees].

At the hearing, plaintiffs' counsel stated:

> [*American Optical*] and [*Dresser*] were cases filed regarding a settlement procedure and there has been no activity in the case. It was just a filing. One of them I don't think the Defendant answered; they told us they weren't going to answer, but a lawsuit had to be filed. And so, they haven't been active lawsuits, and in spite of what [ICRR] says, the omission from the affidavit was inadvertent and it was not intentional.

¶19. Plaintiffs also argue that *Dresser* and *American Optical* did not have to be disclosed under the terms of the Supplemental Agreement because they were not **prior** litigation, as both

8

*Dresser* and *American Optical* were filed after *Eakins*. Plaintiffs' counsel admitted in the hearing that the poorly drawn affidavits did not specifically state that they concerned prior litigation, but he claimed the oversight was his fault and not the result of some conspiracy to hide information from ICRR.

¶20. ICRR challenges the assertion that the affidavits were intended only to disclose lawsuits filed before *Eakins* because the affidavits clearly state all claims were being disclosed. Additionally, several affidavits reported cases filed after April 2, 2001, when *Eakins* was filed, such as *Moore v. Garlock*, which was filed in 2002. ICRR also points to corresponding omissions in the questionnaires as evidence of the employees' deception.

¶21. Even if we agreed with ICRR that plaintiffs cannot claim they intended only to provide information on prior asbestos litigation, this possibility does not lead *ipso facto* to the conclusion that the plaintiffs willfully submitted "manifestly false" affidavits. Clearly, plaintiffs' counsel did not consider the *Dresser* and *American Optical* bankruptcy cases to be of concern to ICRR. The record provides no evidence that plaintiffs or their counsel were trying to conceal information from ICRR.

¶22. Additionally, ICRR suggests no motivation for plaintiffs or their counsel to hide plaintiffs' involvement in these cases. We can imagine no possible benefit or advantage gained by purposely omitting these cases, and none is suggested to us by ICRR. Attributing a less sinister motive to the plaintiffs is much more reasonable. The circuit court found that, because the omissions were immaterial and not committed in bad faith, dismissal of the plaintiffs' claims was unwarranted. Given our deferential standard of review of the factual findings of a

9

circuit court sitting without a jury, we cannot say the circuit court abused its discretion in denying ICRR's motion to dismiss.

*ICRR's Defenses*

¶23.    Plaintiffs assert that under the Settlement Procedure, ICRR reserved three defenses: (1) statute of limitations; (2) valid prior release; and (3) lack of employment with ICRR. Arguably, plaintiffs' involvement in prior asbestos litigation could implicate a statute of limitations defense because such involvement might prove an asbestos-related diagnosis outside the applicable three-year limitations period.    However, any involvement in litigation filed after April 2, 2001, including the *Dresser* and *American Optical* cases, does not assist ICRR in any of its defenses.

¶24.    According to ICRR, the Settlement Procedure did not limit its defenses.    In support of this argument, ICRR points to language in the agreement which states that payments will be made absent the three previously mentioned defenses "or other issues not currently envisioned by the parties."    ICRR claims that it did not envision the submission of false information by plaintiffs or the possibility of paying dishonest plaintiffs.    ICRR argues that information about other asbestos cases is necessary to determine whether a plaintiff settled his claims, and is thus not entitled to further recovery from ICRR, and to identify other parties who may be liable by way of contribution or indemnity for the plaintiff's injuries.

¶25.    After a careful reading of the Settlement Agreement, we agree with the plaintiffs that ICRR reserved three defenses: (1) statute of limitations; (2) valid prior release; and (3) lack of employment.    While ICRR may raise the issue of false affidavits under the catch-all "other

issues not envisioned" language,[3] its asserted reasons for needing information about other asbestos cases was surely envisioned before agreeing to the settlement. Regardless, the two undisclosed cases have no effect on ICRR's defenses. The cases were filed after *Eakins* (so there is no statute of limitations issue); the cases were pending at the time of the hearing (so there is no possibility of an applicable release); and the cases did not affect any employment determinations. Thus, the circuit court's findings are supported by substantial, credible, and reasonable evidence, and the circuit judge did not abuse his discretion by denying ICRR's motion to dismiss on this ground.

*Loss of Confidence and Existence of Prejudice*

¶26. The crux of ICRR's argument is its claim that, because of the "willful and systematic" presentation of "manifestly false" affidavits, neither it nor the courts can have confidence in any information provided by the plaintiffs to support their settlement demands. Thus, ICRR asks this Court to void the settlement agreement, reverse the circuit court's judgment, and dismiss the plaintiffs' claims as a sanction.

¶27. ICRR cites two cases where this Court affirmed the dismissal of a plaintiff's case as a sanction for providing false testimony. In ***Scoggins v. Ellzey Beverages, Inc.***, 743 So. 2d 990, 991 (Miss. 1999), we affirmed the trial court's sanction of dismissal of the plaintiff's personal injury case where she stated in her interrogatories and deposition that she had never been treated for injuries to her arms, legs, back, or hips prior to the accident at issue. However, Scoggins's medical records revealed that she had been treated for pain or numbness

_____

[3] In fact, the singular reason the parties entered into the Supplemental Agreement was to address ICRR's concerns about inaccurate information being provided by some plaintiffs in their Pulmonary Questionnaires.

11

in those areas thirty-five times, diagnosed with widespread arthritis, and undergone a major medical procedure on her back. *Id.* at 992. The trial court did not find Scoggins's excuse of "forgetfulness" to be credible. *Id.* The only issue in the case was damages, and Scoggins's deliberate lies went to the heart of that issue. *Id.* at 994. Sanctions for alleged discovery violations are wholly within the discretion of a trial court, and because we could not say the trial court's findings were manifestly wrong, we affirmed the dismissal. *Id.* at 995.

¶28. In *Pierce v. Heritage Properties, Inc.*, 688 So. 2d 1385, 1388 (Miss. 1997), the plaintiff willfully concealed the existence of an eyewitness to her injury. We noted that willfulness or bad faith is necessary for the sanction of dismissal, and that dismissal is inappropriate due to attorney neglect. *Id.* at 1389. Because substantial credible evidence supported the trial court's dismissal of Pierce's case based on her "manifestly false" responses, we affirmed the dismissal of her case. *Id.* at 1392.

¶29. As the plaintiffs note, the cases cited by ICRR involved clear, willful misconduct on the part of the client as to a critical issue. Conversely, the circuit judge in the case before us today believed the *Dresser* and *American Optical* cases were inadvertently, rather than willfully, omitted. Additionally, the court found that knowledge of the undisclosed cases could not have helped ICRR. Most importantly, trial courts are given wide latitude in the imposition of sanctions. Given the evidence supporting its decision, we do not find the circuit court abused its discretion by denying ICRR's motion to dismiss on this ground.

## II. ICRR'S Motion to Reconsider

¶30. On January 24, 2005, Judge Pickard heard ICRR's motion to reconsider his earlier denial of its motion to dismiss. The focus of the hearing was ICRR's claim that it had "newly discovered evidence" proving the intentional nature of plaintiffs' affidavit omissions.

¶31. ICRR claims that its newly discovered evidence belies plaintiffs' counsel's claim of "inadvertence" in omitting the *Dresser* and *American Optical* cases from the supplemental affidavits. ICRR obtained a "Notice of Disclosure Statement and Chapter 11 Plan Confirmation Hearings and Related Deadlines" from the United States Bankruptcy Court for the Western District of Pennsylvania in the *Dresser* case. According to ICRR, plaintiffs' counsel would have received this notice prior to April 2004. Additionally, ICRR obtained a sworn statement signed by plaintiffs' counsel and filed in the *Dresser* bankruptcy proceedings which stated, "[t]he undersigned certifies that each creditor named on the attached list has executed an Addendum to Representation Agreement authorizing [plaintiffs' counsel] to represent the creditor in bankruptcy proceedings." According to ICRR, these documents prove plaintiffs' counsel knew of and participated in the *Dresser* case prior to April 2002, when the affidavits were signed and sent to ICRR.

¶32. ICRR's "new evidence" adds nothing. Plaintiffs' counsel never claimed he did not know about the cases. As the circuit court noted, even if the new evidence were to prove plaintiffs and their counsel intentionally left out *Dresser* and *American Optical*, ICRR cannot show how the information would have helped them or how the lack of that information injured them. Thus, ICRR has not shown, and we cannot think of any motivation for plaintiffs to have

13

intentionally misstated these facts. We cannot say the circuit court abused its discretion by denying ICRR's motion to reconsider.

*Motion to Compel*

¶33.    ICRR argues the circuit court erred in refusing to require the plaintiffs to produce all "Addendum[s] to Representation Agreement," which could confirm the plaintiffs' false statements were intentional and "calculated to hide the existence of plaintiffs' involvement" in *Dresser* and *American Optical*. The court denied the motion in part based on the privileged nature of the requested documents. ICRR stretches credibility by claiming the documents fall under the "crime/fraud" exception to the attorney-client privilege.[4]    Repeating its earlier finding that the information was irrelevant to the disposition of any issues in this case, the circuit court denied ICRR's motion to compel. We agree and find the circuit court did not abuse its discretion in denying ICRR's motion to compel the production of privileged documents.

*Further Discovery*

¶34.    ICRR asked the circuit court to withhold entry of final judgment until it could conduct additional discovery into "the scope of plaintiffs' assault on the integrity and dignity of the judicial process." The court refused to do so. For the previously discussed reasons, the circuit court did not abuse its discretion in denying ICRR's request for further discovery.

---

[4] The "crime/fraud" exception to the attorney-client privilege applies where "the services of the lawyer were sought or obtained to enable or aid anyone to commit or plan to commit what the client knew or reasonably should have known to be a crime or fraud." Miss. R. Evid. 502(d). *See also* **Hewes v. Langston**, 853 So. 2d 1237, 1246 (Miss. 2003). ICRR cannot genuinely argue the plaintiffs obtained counsel's services in order to commit perjury or perpetrate a fraud on ICRR with respect to irrelevant information about an asbestos manufacturer's bankruptcy proceedings.

*Findings of Fact and Conclusions of Law*

¶35.    ICRR also requested that the circuit court make specific findings of fact and state its conclusions, but the court refused.    However, the hearing transcript reveals that Judge Pickard carefully and clearly articulated his factual findings and legal conclusions.    This Court has held that where a trial court makes general findings of fact and conclusions of law, it has complied with M.R.C.P. 52.  **Century 21 Deep South Properties, Ltd. v. Corson**, 612 So. 2d 359, 367 (Miss. 1992).    As the plaintiffs note, Rule 52 is not jurisdictional, and this Court may decide a case if further findings are unnecessary.  **Patout v. Patout**, 733 So. 2d 770, 773 (Miss. 1999).    Because the record is more than sufficient for appellate review, the circuit court did not abuse its discretion in denying ICRR's request for specific findings of fact and conclusions of law.

### III.    Prior Releases

¶36.    ICRR argues that twelve of the plaintiffs previously released their asbestos-related claims against ICRR by signing prior releases.[5]    Ten plaintiffs signed releases in connection with hearing loss claims, plaintiff Carpenter signed a release in connection with an occupational back injury, and plaintiff Cobb executed a release in connection with the release of his seniority rights.[6]  The releases were executed in the late 1980's or early 1990's.

*The Plaintiffs' Releases*

---

[5] The circuit court agreed with ICRR that a thirteenth plaintiff, cross-appellant James Expose, released his asbestos claims in a prior release for carpal tunnel injuries, discussed *infra*.

[6] Although ICRR states that plaintiff Cobb was one of eleven plaintiffs who signed an occupational hearing loss release, the release Cobb actually signed concerned his seniority rights.

¶37. The releases for hearing loss have three parts. The first part concerns the release of all claims - present and future, known and unknown - arising from any injuries or diseases to the releasee's ears or head resulting in impaired hearing. The second part is relevant to the alleged release of the plaintiffs' current asbestos claims. It states:

> This release specifically excludes any personal injury claim or lien pending against [ICRR], other than for occupational, disease-type illness, or illnesses, to wit, including but not limited to, asbestosis, lead, dust, sand, diesel fumes, paint, PCB, Dioxin, or other toxic or noxious chemical exposure, which claims are specifically released by this document.

The final section is an acknowledgment that the releasee understands the release.

¶38. Plaintiff Carpenter executed a release in connection with the settlement of a back injury claim against ICRR. According to the language of Carpenter's release, it covers:

> all claims, losses, damages, injuries or diseases directly or indirectly caused by or resulting from any alleged exposure of the undersigned to asbestos, coal dust, sand, silica, welding fumes, brass fumes, diesel fumes, fuel fumes, paint vapors, methylbromide, ammonia gas, lead, PCS, dioxin, or other toxic or noxious chemical exposure and all other fumes, dusts [sic] mists, gases and vapors from any chemical or agent, and in addition, from any and all claims, losses, damages, injuries or diseases directly or indirectly caused by or resulting from the exposure of the undersigned to noise . . . .

Before the signature line, the document states, "THIS IS NOT A RECEIPT FOR WAGES – IT IS A GENERAL RELEASE."

¶39. Plaintiff Cobb signed a release in connection with the release of his seniority rights. According to the release, Cobb agreed to "release and forever discharge [ICRR] from any and all claims, demands, grievances, and causes of action of any nature, kind, character, or description, either at common law or under State or Federal Statute."

¶40. Each plaintiff has provided an affidavit explaining that at the time he signed the release, the only claim he had against ICRR was for hearing loss (or back injury/seniority rights), he did not have a pending asbestos claim against ICRR, he had not been diagnosed with any asbestos-related illness, and he only intended to settle the hearing loss (or back injury/seniority rights) claim. Affidavits have also been provided by C.E. Sorey, II, an attorney who represented Carpenter and nine plaintiffs who signed hearing loss releases. Sorey claims that he had no reason to suspect his clients would develop an asbestos illness in the future, the only injuries discussed in the settlement negotiations were the current ones, and he never intended the release to cover anything other than the current injuries.

*Section 5 of the FELA and Relevant Case Law*

¶41. The FELA limits the ability of a common carrier (such as ICRR) to fully exempt itself from liability. Section 5 of FELA states, in part "[a]ny contract, rule, regulation, or device whatsoever, the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by this chapter, shall to that extent be void. . . ." 45 U.S.C. § 55.

¶42. In *Callen v. Pennsylvania Railroad Co.*, 332 U.S. 625, 68 S. Ct. 296, 92 L. Ed. 242 (1948), the United States Supreme Court addressed in dicta the validity of a release under Section 5 of the FELA. Callen claimed that he suffered an occupational back injury. *Id.* at 626. Subsequently, Callen signed a release of all claims he had against the company for personal injuries sustained at the time and place of the injury. *Id.* at 626-27. Unhappy with the $250.00 settlement, Callen sued the company under FELA. *Id.* at 626. According to the Court, "the plaintiff testified that he read and understood the release, knew what he was doing

and intended to waive any further claim . . . ." *Id.* at 627. Although the issue before the Court was the accuracy of certain jury instructions, it did note the rule that one who attacks a settlement must show fraud or mutual mistake. *Id.* at 630. The Court also stated that "a release is not a device to exempt from liability but is a means of compromising a claimed liability . . . ." *Id.* at 631. Finally, "[w]here controversies exist as to whether there is liability, and if so for how much, Congress has not said that parties may not settle their claims without litigation." *Id.*

¶43. ICRR argues that *Callen* is completely dispositive of this case, and because the plaintiffs have not proven fraud or mutual mistake, their claims are barred by the prior releases. However, there are numerous factual and legal dissimilarities between *Callen* and this case. *Callen* involved the release of claims for a back injury sustained in an accident specifically discussed in the release, rather than future, unrelated injuries not known or contemplated by the employee when he executed the release. Here, the plaintiffs' releases, signed more than a decade ago, arose from prior occupational injury claims, not the asbestos-injury claims currently before this Court. While the Supreme Court in *Callen* held that releases are not per se invalid under Section 5 of the FELA, it did include the requirement of a controversy over a "claimed liability." When, if ever, a release may cover future claims is unclear from *Callen*. While proof of fraud or mutual mistake may be required to invalidate a release covering the particular injury being settled (as in *Callen*), one may attack the scope of a prior release and question its effect on future claims pursuant to Section 5 of the FELA.

¶44. Notably, two federal courts of appeals have considered the effect a prior release may have on future claims against an employer, and their decisions are instructive. First, in ***Babbitt v. Norfolk & Western Railway Co.***, 104 F.3d 89, 90 (6th Cir. 1997), the United States Court of Appeals for the Sixth Circuit considered claims under FELA that the defendant was responsible for the plaintiffs' hearing loss during the course of their employment. At issue in ***Babbitt*** was a general release signed by the plaintiffs upon resignation from the railroad. *Id.* The Sixth Circuit distinguished ***Callen*** on its facts, noting that case involved "a general release freeing the railroad from liability **for the injuries sustained in the accident**," rather than future, unrelated injuries. *Id.* at 92 (emphasis in original). The Sixth Circuit determined:

> where there exists a dispute between an employer and employee with respect to a FELA claim, the parties may release their specific claims as part of an out-of-court settlement without contravening the Act. However, where the release was not executed as part of a specific settlement of FELA claims, 45 U.S.C. § 55 precludes the employer from claiming the release as a bar to liability. **To be valid, a release must reflect a bargained-for settlement of a known claim for a specific injury, as contrasted with an attempt to extinguish potential future claims the employee might have arising from injuries known or unknown by him.**

*Id.* at 93 (emphasis added; citations omitted). Accordingly, "the Release cannot serve as a bar to the Plaintiff's [sic] claims under FELA unless the Release was clearly executed as a settlement for their hearing loss injuries." *Id.*

¶45. In ***Wicker v. Consolidated Rail Corp.***, 142 F.3d 690, 692-93 (3d Cir. 1998), the United States Court of Appeals for the Third Circuit considered the FELA claims of plaintiffs who were exposed to toxic chemicals during their employment with the defendant. Examining

the United States Supreme Court's jurisprudence[7] in this area, the court noted that those "decisions have been fact-driven, and consequently do not provide a generally applicable rule of law." *Id.* at 698. However, the court found it clear from these decisions that "[t]o be valid under FELA, a release must at least have been executed as part of a negotiation settling a dispute between an employee and the employer." *Id.* at 700.

¶46. Following this guideline, the Third Circuit declined to adopt the bright line test and rationale advanced by the Sixth Circuit in *Babbitt*. According to the Third Circuit, "it is entirely conceivable that both employee and employer could fully comprehend future risks and potential liabilities and, for different reasons, want an immediate and permanent settlement." *Id.* Therefore, the court held:

> a release does not violate § 5 provided it is executed for valid consideration as part of a settlement, and the scope of the release is limited to those risks which are known to the parties at the time the release is signed. Claims relating to unknown risks do not constitute 'controversies,' and may not be waived under § 5 of FELA.

*Id.* at 701. Employees must be given the opportunity to make a reasoned decision whether to release an employer from liability for future injuries, and "where a release merely details a laundry list of diseases or hazards, the employee may attack that release as boilerplate, not reflecting his or her intent." *Id.*

¶47. Although the plaintiffs here may prefer *Babbitt*'s bright line rule, both parties actually advocate for our adoption of *Wicker*'s holding and rationale. We believe that *Babbitt*'s rule

---

[7] In addition to *Callen*, see *Boyd v. Grand Trunk W. R.R.*, 338 U.S. 263, 70 S. Ct. 26, 94 L. Ed. 55 (1949); *Duncan v. Thompson*, 315 U.S. 1, 62 S. Ct. 422, 86 L. Ed. 575 (1942); *Phila., Balt., & Wash. R.R. v. Schubert*, 224 U.S. 603, 32 S. Ct. 589, 56 L. Ed. 911 (1912); *Mondou v. N.Y., New Haven, & Hartford R.R.,* 223 U.S. 1, 32 S. Ct. 169, 56 L. Ed. 327 (1912).

barring the release of future claims unfairly restricts the ability of an employer and employee to knowingly and voluntarily settle both current and future claims, should the parties so desire. Instead, under the specific language of Section 5 of the FELA and United States Supreme Court precedent, we find the Third Circuit's approach allowing the release of future claims based on specific risks known to the parties to be appropriate.

¶48.    Therefore, the key inquiry is whether or not the risk of developing an asbestos-related illness was known and contemplated by each plaintiff at the time he signed his release. In oral argument, ICRR claimed that because "asbestos" was specifically mentioned in the releases, it was a "known risk." Thus, according to ICRR, any hazard may be classified as a known risk simply by listing it in a release. This, of course, does not address the question of whether the employee ever actually contemplated having the illness or injury being released. The releases examined in *Wicker* actually listed exposure "to toxic substances of any kind" among the many risks covered, but the Third Circuit allowed the plaintiffs to proceed with their claims for chemical exposure because the releases purported to settle future claims regardless of whether the parties knew of and contemplated the potential risks. *Wicker*, 142 F.3d at 702. Clearly, more is required for a risk to be considered "known." The Third Circuit provided valuable guidance as to the scope of a proper release, noting that "a release that spells out the quantity, location and duration of potential risks to which the employee has been exposed" will not violate Section 5 of the FELA. *Id.* at 701.

¶49.    Evaluating releases under Section 5 of FELA is undeniably a fact-intensive process, and an assessment of the parties' intent at the time of agreement "is an essential element of this inquiry." *Id.* at 700. ICRR urges us to look only to the language of the release to prove the

plaintiffs knew of and appreciated the risk of developing an asbestos-related illness. Under general contract law, parties are usually free to contract away their rights, even those which are unknown and not contemplated. However, releases extinguishing an employee's claims for injuries under FELA are held to a higher standard, given the statutory language and Congress' stated intent in passing the Act.[8] The United States Supreme Court in **Callen** specifically considered testimony by the plaintiff that he "knew what he was doing [when he signed the release] and intended to waive any further claim." 332 U.S. at 627. In **Wicker**, the Third Circuit noted "that a release may be strong, but not conclusive, evidence of the parties' intent." 142 F.3d at 701. In fact, the Third Circuit relied on testimony by the plaintiffs that they were unaware of their injuries and the cause thereof at the time they signed the releases as well as affidavits from the attorneys who represented the plaintiffs when the releases were executed. **Id.** at 695.

¶50. We agree with the Third Circuit's observation "that what is involved is a fact-intensive process, but trial courts are competent to make these kinds of determinations." **Id.** at 701. Here, Judge Pickard, designated by the parties as the finder of fact, considered the relevant statutory and case law, examined the releases, testimony, affidavits, and other evidence before him, and concluded that "in light of the foregoing considerations of fact and law, the court finds that releases executed by the aforementioned plaintiffs does not bar them from participation in the settlement agreement."

---

[8] *See* **Kernan v. Am. Dredging Co.**, 355 U.S. 426, 432, 78 S. Ct. 394, 2 L. Ed. 2d 382 (1958) ("[I]t is clear that the general congressional intent was to provide liberal recovery for injured workers . . . ."); **Boyd**, 338 U.S. at 265 ("'Congress wanted Section 5 to have the full effect that its comprehensive phraseology implies.'") (quoting **Duncan**, 315 U.S. at 6).

¶51.    The releases signed by the plaintiffs were the type of "laundry list/boilerplate" documents criticized in *Wicker*. The circuit court could have found the plaintiffs' asbestos claims were contemplated at the time they signed their releases. However, it did not, and we cannot say that Judge Pickard's findings were not supported by substantial, credible, and reasonable evidence. We find the circuit court did not abuse its discretion by denying ICRR's motion to dismiss the claims of the plaintiffs who signed prior releases.

### IV.    Statute of Limitations

¶52.    ICRR argues the claims presented by plaintiffs Deer and Mobley are barred by FELA's statute of limitations, which states, "[n]o action shall be maintained under this chapter unless commenced within three years from the date the cause of action accrued." 45 U.S.C. § 56. In an FELA action, compliance with the statute of limitations is a condition precedent to recovery, rather than an affirmative defense. *Emmons v. S. Pac. Transp. Co.*, 701 F.2d 1112, 1117 (5th Cir. 1983). The burden is on the plaintiff to prove that he filed suit within the three-year period. *Id.* at 1118.

¶53.    In *Urie v. Thompson*, 337 U.S. 163, 170, 169 S. Ct. 1018, 93 L. Ed. 1282 (1949), the United States Supreme Court held that when an occupational illness is the basis for a claim under FELA, the period of limitations begins to run when the employee becomes aware of the condition and its potential cause. The Court stated that "when the specific date of injury cannot be determined because an injury results from continual exposure to a harmful condition over a period of time, a plaintiff's cause of action accrues when the injury manifests itself." *Id.* In *Emmons*, the Fifth Circuit held that FELA's limitations period does not run against a claimant who "has no reason to know of his injury when it is sustained," but begins once he "becomes

23

aware that he has been injured and that his injury is work related." 701 F.2d at 1119 (citing *Urie*, 337 U.S. at 170). Notably, a claimant has an affirmative duty to investigate the potential cause of his injury. *Williams v. S. Pac. Transp. Co.*, 813 F. Supp. 1227, 1232 (S.D. Miss. 1992).

¶54. In *Dubose v. Kansas City Southern Railway*, 729 F.2d 1026, 1031 (5th Cir. 1984), the Fifth Circuit addressed the time at which a plaintiff may be charged with an awareness of his injury and its link to his employment or some other cause:

> When a plaintiff may be charged with awareness that his injury is connected to some cause should depend on factors including how many possible causes exist and whether medical advice suggests an erroneous causal connection or otherwise lays to rest a plaintiff's suspicion regarding what caused his injury.

*See also Harrison v. United States*, 708 F.2d 1023 (5th Cir. 1983) (plaintiff's medical records concealed or lost for several years; physicians' advice negated casual connection); *Aerojet-Gen. Shipyards, Inc. v. O'Keefe*, 413 F.2d 793 (5th Cir. 1969) (several physicians expressly rejected plaintiff's suspicion that his breathing difficulties were caused by his working conditions).

¶55. In *Taurel v. Central Gulf Lines, Inc.*, 947 F.2d 769, 771 (5th Cir. 1991), the plaintiff testified in a deposition that he knew as early as 1980 that his breathing problems might be asbestos related. In 1978 or 1979, seamen on his ship suggested he might have been exposed to asbestos. *Id.* Taurel also stated that in 1980, a Public Health Service physician told him that his breathing problems might be related to asbestos exposure. *Id.* Taurel was diagnosed in 1987 with asbestosis and filed suit in April 1988 under the Jones Act and general maritime

24

law. *Id.* The FELA three-year statute of limitations, 45 U.S.C. § 56, also governs actions under the Jones Act, 46 U.S.C. § 688.

¶56. In reversing the district court, which had granted summary judgment in favor of the defendant, the Fifth Circuit stated:

> The special master's recommendation rests on Mr. Taurel's deposition testimony that fellow seamen and a doctor told him that exposure to asbestos **might** have caused his condition. Neither of these conversations demonstrates that Mr. Taurel knew, or should have known, that asbestos was more likely responsible for his problems than other potential causes.

> The record establishes that no physician diagnosed Mr. Taurel's asbestosis until 1987. **The statements by Mr. Taurel's shipmates in 1978 or 1979 were not medical opinions. Most importantly, from 1975 to 1981, PHS physicians took x-rays of Mr. Taurel's chest four times and concluded each time that his chest was normal. The physician's oral reference to asbestosis in 1980 may have been rank speculation.**

*Taurel*, 947 F.2d at 771-72 (first emphasis in original; remaining emphasis added).

¶57. Like evaluating the scope of a prior release, determining the date upon which a plaintiff knew or should have known about his illness and its connection to his workplace is a fact-intensive inquiry. Once again, we will not reverse the factual findings of the circuit court on this issue if they are supported by substantial, credible, and reasonable evidence.

*Plaintiff Hubert Deer*

¶58. Deer was treated over a period of years by Dr. Walter Boone, a gastroenterologist. In January 1990, Deer visited Dr. Boone with concerns that his shortness of breath was the result of asbestosis. ICRR claims that Deer was aware that his breathing problems might be work-related because he mentioned this thought to Dr. Boone, who noted in the medical record, "Hubert comes in saying that he has been contacted by his lawyer that he may have asbestosis

25

based on increasing amounts of shortness of breath." After an October 1997 visit, Dr. Boone noted in Deer's medical records, "Impression: 1. Exposure to asbestos. 2. Status post peptic ulcer disease. 3. GERD." In a March 1998 entry, Dr. Boone listed the second impression as "Exposure to Asbestos."

¶59. On April 2, 1998, Dr. Robert Middleton diagnosed Deer with asbestos-related lung disease, noting both injury and causation in his report. According to ICRR, Deer knew from prior discussions with Dr. Boone about a possible asbestos-related injury, which placed upon Deer the duty to inquire long before he was diagnosed by Dr. Middleton. ICRR argues that at the very least, Deer should have known about his disease and its relation to his work more than three years before he filed suit on April 2, 2001.

¶60. Deer testified in his deposition that Dr. Boone told him that his shortness of breath was due to the flu. *See Dubose*, 729 F.2d at 1031 (medical advice suggesting an erroneous causal connection delays running of the limitations period). Contrary to ICRR's position, an "impression" of asbestos exposure noted by a gasteroenterologist is hardly enough to begin the statute of limitations. Dr. Boone never evaluated Deer to determine whether or not he actually had an asbestos-related disease, even assuming that as a gasteroenterologist Dr. Boone would have been qualified to do so. Notably, when Dr. Boone listened to Deer's chest on October 10, 1997, he found that Deer's chest was clear. Deer also points to evaluations by lung specialists in 1991 and 1995 which did not reveal an asbestos-related disease at that time. *See Taurel*, 947 F.2d at 771-72 (regular medical tests excluding asbestosis cannot put plaintiff on notice for purpose of the statute of limitations).

26

¶61. The circuit court found that Deer was put on notice of his disease on April 2, 1998, so his claim was timely filed. Given the substantial, credible, and reasonable evidence supporting this finding, we find the circuit court did not abuse its discretion by denying ICRR's motion to dismiss Deer's claims based on its statute of limitations defense.

*Plaintiff Willie Mobley*

¶62. ICRR asserts that as early as November 4, 1996, Mobley was concerned about potential health problems related to asbestos exposure. According to ICRR, Mobley told his doctor that he was a retired railroad worker with a history of asbestos exposure.

¶63. In his deposition, Mobley testified that his doctor, Dr. Jerry Iles, told him that he had emphysema, an assessment recorded in Mobley's medical report. Dr. Iles's deposition supports Mobley's claim that he was diagnosed with emphysema, not an asbestos-related disease. The emphysema diagnosis understandably laid to rest any suspicion Mobley might have had regarding what caused his injury. *See **Taurel***, 947 F.2d at 771-72; ***Dubose***, 729 F.2d at 1031; He was under no duty to seek out second and third opinions to prove his doctor wrong. Mobley was diagnosed with an asbestos-related disease on April 30, 2001, and he filed suit against ICRR on August 9, 2001, well within the statute of limitations.

¶64. The circuit court found that Mobley's claim was not filed outside the statute of limitations. Because substantial, credible, and reasonable evidence supports this finding, the court did not abuse its discretion by denying ICRR's motion to dismiss Mobley's claim based on its statute of limitations defense.

## V. Subsequent Medical Tests

¶65. The Settlement Procedure listed the information to be provided by the *Eakins* plaintiffs to ICRR. The following language is relevant to this issue:

> In cases of those individuals where the claimed disease process is asbestosis or asbestos-related pleural disease, you will submit an ILO form by a certified B-reader. You will also submit a report from an examining physician identifying the physical findings and establishing a diagnosis. The B-reader and the examining physician may be the same individual.

¶66. ICRR argues that three plaintiffs had medical tests performed after their assessment of an asbestos illness by a B-reader associated with plaintiffs' counsel, and those subsequent tests showed no signs of any asbestos disease. ICRR asserts that because these plaintiffs' personal healthcare providers gave them a "clean bill of health regarding asbestos-related diseases," the plaintiffs are not entitled to any settlement money and are acting in bad faith by pursuing their claims.

¶67. Plaintiff McNeil was initially screened by Dr. Abner Landry, a B-reader associated with plaintiffs' counsel. Dr. Landry read McNeil's chest x-ray on July 23, 2001, as a 1/0, showing the presence of pneumoconiosis. Noting the possible presence of lower lobe soft tissue mass, Dr. Landry recommended that McNeil have a CT scan. McNeil's family doctor arranged for the CT scan, which was conducted on August 17, 2001. The radiologist's report of the scan noted, "[n]o evidence of asbestos related pleural or parenchymal disease seen."

¶68. Six weeks later, Dr. William Pinkston, a pulmonologist associated with plaintiffs' counsel, diagnosed McNeil with pulmonary asbestosis. Dr. Pinkston relied on Dr. Landry's B-read in making the diagnosis. No one told Dr. Pinkston about McNeil's intervening CT scan, which was interpreted as showing no signs of asbestos-related disease.

28

¶69. Pursuant to the Settlement Procedure, McNeil submitted the following information to ICRR: (1) an ILO form dated 7/23/01 by B-reader Dr. Landry and (2) a report dated 10/4/01 by Dr. Pinkston diagnosing McNeil with asbestosis.

¶70. Plaintiff Warren was initially screened by Dr. James Ballard, a B-reader associated with plaintiffs' counsel. Dr. Ballard read Warren's chest x-ray on April 25, 2001, as a 1/0. Warren's physician, Dr. Bryan Calcote, ordered a follow-up set of chest x-rays on June 22, 2001, to look for asbestos-related disease. The radiologist who read the x-rays noted, "[l]ungs show no evidence of disease."

¶71. On October 5, 2001, Dr. Pinkston evaluated Warren. Relying on Dr. Ballard's B-read report, he diagnosed Warren with pulmonary asbestosis. No one told Dr. Pinkston about Warren's intervening chest x-rays.

¶72. Pursuant to the Settlement Procedure, Warren submitted the following information to ICRR: (1) an ILO form dated 4/25/01 by B-reader Dr. Ballard and (2) a report dated 10/5/01 by Dr. Pinkston diagnosing Warren with pulmonary asbestosis.

¶73. Plaintiff Woodberry was initially screened by Dr. David Dunigan around May 17, 2001. Dr. Pinkston, relying on Dr. Dunigan's report, diagnosed Woodberry with pulmonary asbestosis. Dr. Pinkston was not informed that a chest x-ray performed on Woodberry a week later was "normal" according to the evaluating radiologist and another physician, who noted, "[n]o abnormality is identified in the chest."

¶74. Pursuant to the Settlement Procedure, Woodberry submitted the following information to ICRR: (1) an ILO report dated 5/17/01 by B-reader Dr. Dunigan and (2) a report dated 10/6/01 by Dr. Pinkston diagnosing Woodberry with asbestosis.

29

¶75.    ICRR asserts that Woodberry's claim should be dismissed because his B-reader, Dr. Dunigan, did not submit his report on the proper ILO form, thus failing to satisfy the specific requirements of the Settlement Procedure.    This argument is super-technical and meritless. Dr. Dunigan specifically stated in his report, "[a]   PA chest radiograph dated March 29, 2001 was evaluated for the presence and classification of asbestos related pneumoconiosis utilizing the 1980 ILO guidelines."    Further, the report contained all of the information requested on the ILO form.  This argument is without merit.

¶76.    ICRR also attacks the credibility of the plaintiffs' B-readers and Dr. Pinkston in an attempt to show "bad faith" on the part of Appellees and their counsel.    ICRR discounts Dr. Pinkston's findings because he relied on the B-reads of people he did not know.    Also, ICRR points to a study published in a radiology journal that found plaintiff-retained B-readers were more likely to make a 1/0 reading than "blind" readers.

¶77.    ICRR's contentions are irrelevant. The Settlement Procedure required an ILO form by a certified B-reader and a report from an examining physician identifying the physical findings and establishing a diagnosis.    Each plaintiff complied with these requirements.    The agreement did not place restrictions on the B-readers or evaluating physician, and ICRR cannot fault plaintiffs for following the requirements of an agreement it now dislikes.

¶78.    Further, the plaintiffs' subsequent medical tests were interpreted by radiologists or family physicians, not certified B- readers.    According to ICRR's own definition, B-readers "are physicians certified by the National Institute for Occupational Safety and Health as proficient in the classification of chest x-rays using the ILO scale."    The circuit court noted that "the secondary diagnos[es] [were] not made by a B-reader, someone who has expertise in

30

the matter," as one reason to deny ICRR's motion to dismiss. The plaintiffs also highlight, in detail, the impressive qualifications of Dr. Pinkston, including his twenty years of experience as a practicing pulmonologist and his position on the Attending Staff at the University of Mississippi Medical Center.

¶79. ICRR voluntarily entered into the Settlement Procedure, and the circuit court found that it was bound by that agreement. Given the substantial, credible, and reasonable facts supporting the circuit court's findings, it was not an abuse of discretion to deny ICRR's motion to dismiss the plaintiffs' claims based on subsequent evaluations.

## VI.     Cross-Appeal: James Expose's Prior Release

¶80. The circuit court dismissed plaintiff Expose's asbestos claim against ICRR because he signed a carpal tunnel release on May 10, 2004, three years after this action was filed. Therefore, his asbestos claim was pending when he signed the release. The release clearly states, "[i]t's further understood and agreed that this is a full and complete release from any and all claims which are known or reasonably could have been known and the damages resulting therefrom, whether for personal injuries or otherwise." The circuit court concluded that because Expose's asbestos claim was pending at the time he signed the carpal tunnel release, he obviously knew the risks of asbestos exposure when he executed the release. Given the substantial, credible, and reasonable evidence supporting the circuit court's decision, we cannot find Judge Pickard abused his discretion in granting ICRR's motion to dismiss Expose's asbestos claims based on the prior release.

## CONCLUSION

¶81. For all of these reasons, we affirm the judgment of the circuit court on both direct appeal and cross-appeal.

¶82. **AFFIRMED ON DIRECT APPEAL AND CROSS-APPEAL**.

**SMITH, C.J., WALLER AND COBB, P.JJ., DIAZ, CARLSON AND GRAVES, JJ., CONCUR. EASLEY, J., CONCURS IN PART. RANDOLPH, J., NOT PARTICIPATING.**