MAX N. TOBIAS, Jr., Judge.
This appeal arises from a claim for damages under the Federal Employers’ Liability Act (“FELA”)[1] for injuries allegedly sustained as a result of heavy lifting done by the plaintiff, Jerome Ezidore (“Ezi-dore”), while employed by the Public Belt Railroad Commission of the City of New Orleans (“NOPB”). NOPB argues that because Ezidore cannot pinpoint any specific accident or occurrence on the job that caused his injuries, he is precluded from recovering under the Federal Employer’s Liability Act (“FELA”); further, NOPB maintains that there is insufficient medical testimony or objective evidence to link Ezi-dore’s symptoms to the work he did for NOPB.
Ezidore began working for NOPB in the mid-1970s. For the next several years, Ezidore performed a variety of jobs for the railroad, including welders’ helper, dump truck driver,[2] and lookout. While working for NOPB, Ezidore worked with a number of NOPB employees, including Glenn Des-hotel (“Deshotel”), who worked as a track inspector and welder for NOPB. On the occasions when they worked together, Deshotel and Ezidore would use a small 12motorcar to travel the miles of track in and around New Orleans, repairing damaged track, and replacing missing bolts in the track. Ezidore testified that when he and Deshotel worked together, they were able to move the small motorcar together. However, NOPB employees, including Ezi-dore, would frequently work alone while using the small motorcar, and would not have assistance in its operation or maneuvering.
The “small” motorcar (hereinafter referred to as the “Motorcar”) utilized by the NOPB [3] in its track work is a two-man vehicle, which can be operated either forwards or backwards. It has two metal handles protruding from the rear, and the open-air cab is surrounded by a heavy curtain that can be drawn closed or remain open. Two methods exist by which the Motorcar can be turned. If the Motorcar is near a switch in the section of the track system containing more than one track, the switch can be utilized to turn the car around, obviating the need to remove the Motorcar from the tracks. If, however, the Motorcar is not near a switch at the time it is turned, or if it is on the single, main track, it has to be manually lifted and maneuvered to travel in the opposite direction at a point where a street crosses the track.
In order to move this Motorcar without the benefit of a switch, the individual(s) *797 operating the Motorcar has to grasp the handles and lift the rear, lifting the rear wheels off of the ground so that the entire car can be swung to the side, essentially pulling it off the track. Then, the car has to be turned, replacing the wheels of the car on the track in the opposite direction. According to the | «testimony of various NOPB employees, the difficulty of this task varied with the type of street crossing.[4] Further, according to both testimony of railroad employees and photographs of street crossings utilized by the NOPB, the road surface may have been eroded in some spots, creating holes or ditches alongside the rail.
On 29 March 1999, Qwest Communications Corporation of Delaware (“Qwest”) obtained a permit to lay fiber optic cable along the tracks maintained by NOPB, and Qwest crews began the project shortly thereafter. Under federal law, NOPB was required to either train the conductors working for Qwest to protect the crews from oncoming trains, or provide lookouts for the crews. NOPB provided lookouts for the crews, and those lookouts would use either the small or large motorcar to reach the worksite,[5] haul equipment needed by the crew, and/or protect the crew. Ezidore claimed that he used the Motorcar when he worked as a lookout on the Qwest job.
Sometime in early May 1999, Ezidore developed numbness, tingling, and pain in his neck, shoulder, arms, and fingers. On 31 May 1999, Ezidore presented to Courtney Russo, M.D., an orthopedic surgeon, with complaints and was diagnosed with two herniated discs in his cervical spine and bilateral carpal tunnel syndrome. Dr. Russo prescribed physical therapy and a cervical collar and pillow. He placed Ezi-dore on a no-work status on 24 June 1999.
When he presented to Dr. Russo, Ezi-dore did not relate his pain to his work at NOPB, and Dr. Russo’s records reflect that Ezidore did not inform Dr. Russo of 1 ¿having to perform any heavy lifting in connection with his work. In fact, Dr. Russo’s records do not relate Ezidore’s complaints to injuries sustained on the job at all. Further, the notes taken by Dr. Russo during his initial evaluation indicate that Ezidore’s first symptoms began at 5:30 a.m. on 11 May 1999. Ezidore did not complete any accident report with the NOPB concerning any incident that may have caused his injuries. NOPB asserts that it did not even learn that Ezidore was claiming a work-related injury until he filed suit over one year later.
Ezidore filed suit on 18 July 2000, alleging that
[o]n or about June 10, 1999, and for five years before that date, Jerome Ezidore was a trackman working for the City of New Orleans by and through the Public Belt Railroad Commission of the City of New Orleans, and he had to pick up and turn around a heavy motor car as a regular part of his job each day. This lifting and manhandling of the motorcar caused severe injuries to his neck and back, each episode exacerbating the injury further.
Ezidore alleges, in particular, that NOPB was negligent in failing to provide him with a reasonably safe workplace or equipment; failing to provide him with sufficient assistance in his job to lift and turn the Motorcar; and failing to give him suffi *798 cient time to move the Motorcar in a safe manner.[6]
A bench trial in this matter began on 17 March 2003 and concluded on 14 April 2003. During the trial, the court heard testimony from a number of fact witnesses, including Ezidore and his wife, several coworkers, and his supervisor,' as well as a number of expert witnesses in medical causation, ergonomics, and engineering.
| sEzidore testified regarding his history working for NOPB. He confirmed that he had worked for NOPB since the late 1970s,[7] and described the numerous jobs he had performed at the railroad. He described the motions he used to move the Motorcar off of the track, and how he replaced it back on the track. Ezidore testified that moving'the Motorcar was the heaviest work he had to do with NOPB and that he had asked his supervisor twice for assistance in using it.- Ezidore further testified that, at times, he would have to turn the Motorcar at a street crossing without benefit or use of a switch if a train were coming and he did not have time to make it to a switch. His testimony, as well as that of other witnesses, established that a trackman must have the Motorcar at least four feet from the track for the train to pass safely. Further, although the Motorcar could be operated in the backward direction, obviating the need to turn the car around, Ezidore testified that he did not feel safe operating the car in that manner, because the curtain obstructed his vision.[8]
With regard to the Qwest job, Ezidore testified that he began working on that project as a flagman, and that he used the Motorcar during that job. He was unable to state with any specificity on what dates or in what specific circumstances he used the Motorcar during the Qwest job, although he did testify that he used the Motorcar in the spring of 1999.
Ezidore related that his symptoms began as a “crook” in his neck, and that he hoped it would resolve. He then began experiencing numbness and pain in his arms, and his wife rubbed down his arms with alcohol to soothe them. His | (¡discomfort progressed to pain in his cervical spine, and eventually, his lumbar spine. Ezidore called Dr. Russo on the advice of a friend, and reportedly could not get an appointment for two or three weeks, or until 31 May 1999. He admitted that he could not relate his neck and back pain to any specific incident or accident while working.
Deshotel testified that he had worked with Ezidore at NOPB on a number of occasions and that he was familiar with the use of the Motorcar. He had worked with this type of motorcar at NOPB since he began with the railroad in 1966. He further testified that NOPB never told him the weight of the Motorcar and he was never given instructions on how properly to remove it from the track; he learned how to maneuver the Motorcar by watching other employees at the railroad. He *799 was familiar with an NOPB rule that stated that each employee was responsible for determining his own lifting limitations. He admitted that he did not know how much force it took to lift the Motorcar, and that he did not know his own lifting limitations. He testified that, given the choice, he would prefer to have assistance when he moved the Motorcar off the tracks, even though he testified that it was designed to be moved by one man. Deshotel testified that he had suffered three hernias; one in 1997 and two in 1998. He believed that lifting the Motorcar contributed to the hernia, but did not file a claim for his injuries. He testified that NOPB was aware that he had suffered the hernias.
Deshotel described and demonstrated for the trial court how he would maneuver the Motorcar at a street crossing to turn it around on the tracks, and estimated that the amount of force required to lift the end of the Motorcar was 17approximately 150 to 200 pounds. He confirmed that to fully remove the Motorcar from the tracks, he would sometimes have to grab the Motorcar near the wheels by the metal piping that framed the back of it to completely pull it from the track. If, however, the curtain were down on the Motorcar, he would instead push the Motorcar from the front to remove it from the track. The Motorcar would have to be removed at least four feet from the track in order for a train to pass safely. Once a train had passed, he would replace it on the rail by pushing the car back over the rail and using the handles to swing the rear wheels back onto the track.
Deshotel testified that, although the Motorcar could be driven in reverse, NOPB had a rule that encouraged its employees to turn the Motorcar around on the track before returning it to the roundhouse, so that the driver’s vision would not be impaired at street crossings. He further testified that NOPB maintained approximately two miles of main line track, and that in that stretch of track, there are 72 switches, with each crossing having a switch within 200 feet of each crossing.
Deshotel was familiar with the Qwest job and testified that Ezidore worked as a lookout on that job, sometime using the Motorcar to reach the worksite. According to the “Daily Foreman Reports” maintained by Deshotel, one of the motorcars, either the large or small motorcar, was used by Ezidore on the following dates: 29 April and 13, 14, 17-20, and 22-27 May 1999. The documents do not specify which motorcar was used on which date. Des-hotel was unaware at the time that Ezi-dore left work in June 1999 that his condition and/or injuries were related to work.
IsSeveral of Ezidore’s co-workers testified regarding use of the Motorcar and the Qwest job. All of his co-workers agreed that turning and moving the Motorcar was one of the heaviest jobs they had to perform with NOPB; they also reported turning the Motorcar in the way described by Ezidore and Deshotel. Further, the NOPB employees agreed that NOPB had provided no specific instruction on how to turn the Motorcar; they learned by observing co-workers. However, Leo Williams, a co-worker of Ezidore, testified that he never had to get out of the way of an oncoming train without adequate warning. He testified that the yardmaster[9] was always aware of his posi *800 tion and that he always carried a radio when he operated the Motorcar. Further, Ezidore’s supervisor, Ray Lubrano (“Lu-brano”), denied that Ezidore had ever asked for assistance in turning the Motorcar. Like his other co-workers, Lubrano testified that he was not aware that Ezi-dore’s injuries were related to his work for NOPB. Manuel Sims, another co-worker of Ezidore, offered testimony to suggest that of the dates on which a motorcar was used on the Qwest job (according to the foreman’s report completed by Des-hotel), his recollection was that the large motorcar, and not the Motorcar, was used.
Dr. Russo testified that he first treated Ezidore on 31 May 1999, when Ezidore presented complaining of pain in both of his arms and shoulders, numbness in his arms, and cramping in his hands. He also testified that his records reflect that Ezi-dore didn’t do any heavy lifting, and did not relate his pain to any “recent accident or injury.” Dr. Russo opined that he suffered from degenerative changes to his spine that occurred over several years. Dr. Russo further confirmed Rthat he ordered an electromyelogram (EMG), which had normal results, and a nerve conduction study, which led to a diagnosis of bilateral carpal tunnel syndrome. An MRI confirmed that Ezidore had advanced osteoarthritis in all levels of his cervical spine, as well as bulging discs at C3-4 and C5-6. He confirmed that Ezidore later complained of pain in his lumbar spine.[10]
Dr. Russo identified an “Attending Physician’s Statement” prepared by his office on or about 11 October 2000, which was sent to Trustmark Insurance Company, ostensibly to seek coverage for Ezidore’s treatment. He confirmed that the form noted that Ezidore’s condition was not “due to injury or sickness arising out of plaintiffs employment.” He further testified that, although Ezidore signed the form at the top, a secretary in his office thereafter completed the contents of the form. With regard to these forms, his practice was to review the form briefly, and then have his secretary affix his signature by use of a rubber stamp.
Dr. Russo opined that although the carpal tunnel syndrome may have contributed to the numbness Ezidore experienced in his fingers, he attributed most of his symptoms to the “disrupted” cervical discs.[11] He testified that Ezidore had a pre-exist-ing arthritic condition in his cervical spine that was exacerbated by a repetitive job in which he had to undergo heavy lifting.
Dr. Russo testified that a disruption of the vertebrae such as the one sustained by Ezidore could be caused by compression on those vertebrae resulting from a twisting motion or by strain involved in moving a heavy object. He testified that although he was unaware of the type of work performed by Ezidore at |inthe time he initially treated him, he later learned of the nature of Ezidore’s work in or about August 2001 and that that information was consistent with a possible cause of the injuries sustained by Ezidore.[12] Dr. Russo further testified that Ezidore had an advanced degenerative condition in his entire *801 spine, and that an accident was not necessary to bring on the symptoms he experienced; he confirmed that, given the advanced degenerative condition of Ezidore’s spine, his symptomatology could have been spontaneous.
On cross-examination, Dr. Russo admitted that, as evidenced by the insurance form submitted by his office on or about 14 July 1999, he must have been aware that Ezidore worked as a trackman for NOPB when he began complaining of pain and numbness. Further, Dr. Russo acknowledged that his record from the initial visit on 31 May 1999 indicated that Ezidore told him that he did not do any heavy lifting and had not had any kind of accident. He testified that he must have received a history from Ezidore during that initial visit, and that it did not reflect that Ezidore was doing any heavy lifting or that his injury was in any way associated with his job.[13] Finally, Dr. Russo admitted that his opinion was “speculation.”
Kurt Hegmann, M.D., testified as a medical expert specializing in epidemiology, ergonomics, and occupational medicine. He testified that Ezidore had symptoms consistent with cervical radiculopathy, and that those symptoms were consistent with the herniated discs in his cervical spine. Dr. Hegmann noted l^that frequently, numbness in the arms might result from a pinched nerve in the neck. He confirmed that Ezidore had advanced degenerative disc disease that predated his complaint of injury in May 1999. He testified that such a degenerative condition is worsened by alcohol and tobacco use,[14] and that Ezidore was undergoing an advanced aging process.
Edward Stanley testified regarding the weight and measurements of the Motorcar.[15] He testified that the force required to lift the Motorcar at the rear, using the handles, was 160 pounds and that the total weight of the Motorcar was 860 pounds. Charles Prewitt, P.E., testified that it would take only 149 pounds of force to lift the rear end of the Motorcar. Stanley admitted that the scale used to measure the force required to lift the rear of the Motorcar was calibrated to the nearest 20 pounds and that any force over 140 pounds would push the reading to the 160-pound mark.
Andrew Jackson, Ph.D., testified as an expert in ergonomics. He testified that the lifting of the rear end of the Motorcar was a hazardous job that increased the risk of injury to NOPB employees. He further opined that under the National Institute for Occupational Safety and Health (“NIOSH”) guidelines, the recommended maximum weight of lift for this task would be 48.45 pounds. He noted that a lift weight of 160 pounds was three times as much lift weight as a worker safely should handle..
l,j,Dr. Hegmann testified that he utilized the NIOSH evaluation process to evaluate the etiology of Ezidore’s condition. He *802 found no evidence to link the lifting work claimed to have been done by Ezidore to his cervical herniations. Further, Dr. Hegmann testified that the lifting index utilized by Dr. Jackson in his evaluation of this case did not apply with regard to strain on the neck, but rather was specific to lumbar injuries. He further testified that the equation is based on repetitive daily lifting activities, and not to a single lifting occurrence. He described the task of lifting and/or turning the Motorcar as “a rare and intermittent task.” He likened the turning of the Motorcar as easier than moving a wheelbarrow full of concrete (assuming it weighed 180 pounds), because the Motorcar has two instead of one wheel in the front, lending it more stability. He opined that using the Motorcar was reasonably safe work for Ezidore to perform.
The trial court rendered judgment in favor of Ezidore on 25 July 2003, awarding him $45,000.00 for pain and suffering; $94,563.00 in past lost wages; $117,800.00 in future lost wages; and costs and interest from the date of judicial demand.[16] In its reasons for judgment, the trial court noted NOPB’s arguments regarding the lack of any accident report completed by Ezidore; his inability to point to any specific event or accident that caused his injuries; and his apparent failure to prove that he even used the Motorcar on the Quest job. However, the trial court found that Ezidore’s testimony was credible when he testified that he used the Motorcar in the spring of 1999 and further accepted the testimony of Dr. Jackson that the movements associated with “lifting, turning, and maneuvering” |iathe Motorcar exceeded the NIOSH lifting index by a factor of three, presenting a high risk of injury to workers. As for NOPB’s assertion that Ezidore never asked for assistance in using the Motorcar, the trial court believed Ezidore when he testified that he had asked for assistance, to no avail.
NOPB specifies three assignments of error. First, NOPB asserts that the court erred as a matter of law in applying an incorrect legal standard for considering what it characterizes as “speculative medical evidence” in support of Ezidore’s claim. Second, NOPB asserts that the court erred in accepting the “speculative” medical testimony of Dr. Russo regarding the cause of Ezidore’s injury in the absence of clear and objective evidence. Finally, NOPB takes issue with the trial court’s finding that Ezidore suffered an injury in the course and scope of his employment with NOPB as it maintains that Ezidore’s claims were disproved by evidence put forth by NOPB at trial.
Ezidore brought his cause of action under FELA, which provides a remedy to railroad employees who are injured or killed in the course of their employment. Swan v. New Orleans Terminal Company, 98-2694, p. 5 (La.App. 4 Cir. 5/21/99), 745 So.2d 52, 55, citing, Consolidated Rail Corp. v. Gottshall, 512 U.S. 532, 114 S.Ct. 2396, 129 L.Ed.2d 427 (1994). Although FELA gives rise to a cause of action under federal law, FELA claims may be adjudicated in state courts applying federal substantive law and state procedural law. Id., citing Alabama Great Southern Ry. Co. v. Jackson, 587 So.2d 959 (Ala.1991), cert. dismissed, 502 U.S. 1083, 112 S.Ct. 994, 117 L.Ed.2d 155 (1992). FELA provides a remedy to an injured railroad employee who can establish (1) an injury in the course and scope of *803 his employment with the railroad; (2) negligence on the part of the employee; and (3) the employer’s negligence lucaused to some extent his injuries.[17] The employer’s negligence need not be the sole cause of the employee’s injuries; the employee must only establish that the negligence of his employer played a part, no matter how slight, in causing his injury. Id., citing, Elliott v. Union Pacific R.Co., 863 F.Supp. 1384 (D.Colo.1994).
With regard to its first assignment of error, NOPB argues that the trial court erred when it considered the medical evidence put forth by Ezidore through the testimony of Dr. Russo at trial. NOPB asserts that Dr. Russo’s testimony was purely speculative in nature with regard to causation; specifically, NOPB points to the fact that Dr. Russo’s own records do not relate Ezidore’s injuries to his work or to any heavy lifting until later in his treatment, after suit had already been filed. Further, it attacks Dr. Russo’s opinion as not probative on the issue of causation, insofar as he testified that Ezidore’s injuries “might have” or “could have” been caused by lifting the Motorcar. NOPB maintains that Dr. Russo himself admitted that his opinions in this matter were speculative.
NOPB relies upon the holding in Mayhew v. Bell Steamship Co., 917 F.2d 961 (6th Cir.(Ohio) 1990). In Mayhew, the U.S. Sixth Circuit Court of Appeals held:
Although a Jones Act [or FELA] plaintiff need not present medical evidence that the defendant’s negligence was the proximate cause of the injury, we believe that a medical expert must be able to articulate that there is more than a mere possibility that a causal relationship exists between the defendant’s negligence and the injury for which the plaintiff seeks damages.[18]
Id. at 963 [emphasis in original]. In Mayhew, the trial court excluded portions of the plaintiffs treating physicians testimony on the grounds that it was speculative regarding the causal link between the accident and a back injury. The plaintiff, an injured seaman, argued that the United States Supreme Court decision in Sentilles v. Inter-Caribbean Corp., 361 U.S. 107, 109-10, 80 S.Ct. 173, 175, 4 L.Ed.2d 142 (1959), mandated the inclusion of testimony that “relate[d] to the causal relationship between the [alleged injury-causing incident] and the plaintiffs herniated or prolapsed disc.” Mayhew, 917 F.2d at 962. The court, however, found that in matters relating to admitting expert testimony, the trial court had broad discretion and that Sentilles did not circumvent the rule of evidence that “medical evidence has to have some reasonable basis and have some degree of certainty.” Id. at 962-3. The Mayhew court did acknowledge, however, that due to the relaxed standards applied in FELA suits, a medical expert need not articulate to a “reasonable degree of medical certainty” that the employers negligence caused the plaintiffs injury. Id. at 964; see also Sentilles v. Inter-Caribbean Corp., 361 U.S. at 109-10, 80 S.Ct. at 175; Picou v. American Offshore Fleet, Inc., 576 F.2d 585, 588, 1978 A.M.C. 2574, 2574 (5th Cir.(La.) 1978).
In Sentilles, a seaman sued his employer under the Jones Act for an onset of tuberculosis, allegedly triggered by a fall he *804 suffered aboard his employer’s vessel. He reportedly had been examined two months prior to the fall, and there was no sign of tuberculosis in his lungs at that time. A specialist examining his x-rays taken years before the fall opined, in retrospect, that a small scarred area on his lung was actually a pulmonary lesion. At trial, the specialist gave the opinion that his disease “might have” been the result of his fall; another specialist, who had h (¡treated the plaintiff, could not distinguish whether the fall or another potential cause was more likely to have caused the injury; and a third expert, who did not treat the plaintiff, testified that the accident “probably aggravated his condition.” Id., 361 U.S. at 109, 80 S.Ct. at 175.
The Supreme Court held that:
[t]he jury’s power to draw the inference that the aggravation of petitioner’s tubercular condition, evident so shortly after the accident, was in fact caused by that accident, was not impaired by the failure of any medical witness to testify that it was in fact the cause.
Id., 361 U.S. at 109, 80 S.Ct. at 175. Therefore, it is the reasonableness of the jury’s inference that should be the focus of a reviewing court, and not whether the reviewing court would have found otherwise due to “conflicting circumstantial evidence.” [19] Id., 361 U.S. at 110, 80 S.Ct. at 175.[20]
NOPB strongly argues that Dr. Russo never articulates that Ezidore’s condition was more likely than not caused by his use of the Motorcar while working for NOPB. A review of the record reveals that Dr. Russo testified that Ezidore suffered from a pre-existing condition that was aggravated by repetitive lifting in his work. Dr. Russo admits that he did not know about the type of work done by Ezidore when he first began treating him and did not initially relate his injuries to his work. Dr. Russo confirmed that his first impression that Ezidore did any type of heavy lifting was when counsel for Ezidore supplied a possible cause of Ezidore’s condition more than one year after Ezidore first presented to him.
|17Ezidore, however, argues that the failure of Dr. Russo’s records to link his work at the railroad to the onset of his symptoms is understandable in light of what was most likely a miscommunication between Dr. Russo and Ezidore. Ezidore admitted in his testimony that he could not point to any single event or “accident” that caused his pain; he simply related that he was working as a lookout for Qwest on the railroad and that one morning, he awoke with neck pain. Sometime shortly thereafter, that pain progressed to numbness in his arms. Dr. Russo testified that Ezi-dore’s symptoms are consistent with the disc “disruptions” in his cervical spine and also with Ezidore’s carpal tunnel syndrome. His opinion changed, however, in light of information that he was not apparently privy to in Ezidore’s prior treatment: that Ezidore was required to lift the Motorcar shortly prior to experiencing his neck and back pain. Thus, although Dr. Russo did not precisely testify that Ezi-dore’s condition was “more likely than not” related to his work, he did testify that Ezidore’s use of the Motorcar was proba *805 bly an aggravating factor in exacerbating his back condition.
We recognize that NOPB put forth evidence that using the Motorcar did not cause Ezidore’s condition; however, the trial court was called upon to make a credibility determination among multiple fact witnesses, as well as to evaluate the testimony of several expert witnesses. It is axiomatic that a trial court is afforded great deference in its evaluation of credibility of witnesses that appear before it. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). Further, we note that “[a]n appellate court may not reverse findings of fact in a FELA case unless there is a complete absence of any probative facts to support the fact finder’s conclusions.” Bodenheimer v. New Orleans Public Belt, 2002-0441, p. 6 (La.App. 4 Cir. 5/14/2003), 845 So.2d 1279, 1285, citing, Dennis v. Denver & Rio Grande Western Railroad Co., 375 U.S. 208, 84 S.Ct. 291, 11 L.Ed.2d 256, (1963); Polotzola v. Missouri Pacific Railroad Co., 610 So.2d 903 (La.App. 1st Cir.1992).
We do not find that the trial court was manifestly erroneous in lending credence to Ezidores testimony regarding his use of the Motorcar. Further, we do not find that the trial court erred in determining that the Motorcar posed an unreasonable risk of harm, in light of the testimony that NOPB required each employee to know his own lifting limitations, but did not supply specific information regarding the amount of force necessary to lift the Motorcar or specific training on how to safely turn the Motorcar. The NOPBs argument that employees should use switches to turn the ear around is practical only in certain stretches of track where switches are available between two tracks. Further, NOPBs assertion that the Motorcar can safely be driven in reverse is confused by the NOPB rule that the Motorcar should be operated in the forward direction “whenever possible.” Although we recognize that numerous NOPB employees have used the Motorcar without incident or injury, we cannot say that the trial court erred in finding that its use without proper training or assistance created an unsafe workplace for Ezidore.
Finally, we do not find that the trial court was manifestly erroneous in considering the testimony of Dr. Russo in reaching its decision. Although we are mindful of the need to preserve evidentia-ry standards and rules, as espoused by the court in Mayhew, supra, we are mindful that the trial courts function in admitting and evaluating evidence also should be protected. Further, as the finder of fact in a FELA case, the trial court was entitled to “take all the circumstances, including the medical testimony into consideration.” Sentilles, 361 U.S. at 109-10, 80 S.Ct. at 175. Thus, although Dr. Russos records do not identify the lifting of the Motorcar |iaas the culprit in causing the herniation or “disruptions” of Ezidores cervical spine, the trial court properly accepted his testimony regarding his treatment of Ezidore and his opinion regarding the cause of his condition. Even though Dr. Russos records do not support Ezi-dores claims, Ezidores claims are supported by Dr. Russos testimony. In light of the deference given to the evaluations of the finder of facts of evidence in FELA cases, we do not find that the trial courts inference of causation for Ezidores injuries was unreasonable.
For the foregoing reasons, the judgment of the trial court is affirmed.

AFFIRMED.

. 45 U.S.C. § 51, etseq.

. His position as dump truck driver apparently required him to not only deliver and pick up supplies and materials used by the railroad, but also required him to repair damaged asphalt and roadways at railroad crossings.

.There are two motorcars utilized by the NOPB in its track work. The "small” motorcar is the one Ezidore alleged caused his injuries. NOPB also uses a larger, four-man vehicle to haul heavy equipment. Therefore the use of the term "small” simply distinguishes the motorcar at issue from the larger one, which does not have handles such that it can be manually turned.

. The various streets that intersect the tracks where Ezidore worked were made of asphalt (both in good and poor condition), shells, gravel, dirt and/or sand.

. Or, as the testimony revealed, use personal vehicles to reach the site where they were to stand lookout.

. To the extent that some of the specific allegations of negligence overlap or encompass others, we have condensed the allegations for the purposes of this opinion. In short, all of the allegations involve the manner and circumstance under which Ezidore was required to maneuver the Motorcar in the course of his employment with NOPB.

. We note that Ezidore was terminated in or around 1977 by NOPB for absenteeism relating to marriage problems he was experiencing at that time. Ezidore returned to work in 1978 with NOPB and had been in its employ continuously until he became injured.

.The Motorcar ran on the track and necessarily did not require any steering to navigate its path; the operator would merely have to operate the throttle and the brake to drive the Motorcar, whether in the forward or backward direction.

. The function of a yardmaster was likened to that of an air traffic controller; he was responsible for knowing the position of all employees and crews working on the track in his area and warning employees of oncoming trains by radio. Further, testimony established that an oncoming train would have been subject to a speed limit of about ten miles per hour.

. Ezidore’s medical records confirm that he first complained of lumbar pain to Dr. Russo in November 1999.

. Dr. Russo was accepted by the court as an expert in orthopedic surgery and testified in that capacity, as well as a fact witness. He declined to describe Ezidore’s disc injuries as "herniations”, although he had described them as such in his own records. He preferred instead to use the term "disruption” to describe the injury to Ezidore’s cervical spine.

.NOPB takes issue with the fact that Dr. Russo learned about Ezidore’s work history from counsel for Ezidore, and not from Ezi-dore himself.

. However, Cherry Aquino, a licensed physical therapist, testified that she rendered treatment to Ezidore on 25 June 1999. She confirmed, using the medical record prepared by her at the time of the visit, that she had taken a history from Ezidore and that he told her that he worked as a “railroad conductor requiring heavy lifting.”

. Ezidore had a history of smoking and drinking.

. Ezidore sought to have Stanley accepted by the court as an expert in physics, but the trial court declined to accept him as an expert in light of his limited qualifications. The trial court did, however, allow him to testify as a fact witness regarding the measurements he took of the Motorcar.

. On 30 September 2003, the trial court amended its judgment in response to a motion for new trial filed by NOPB to award judicial interest from the date of judgment and to reflect interest on court costs only from the date of the fixing of the court costs. The judgment was reaffirmed in all other respects.

. FELA also requires that the employee’s work be related to interstate commerce; the parties have stipulated that this factor is not at issue in this litigation.

. We note that, insofar as the rights and remedies of seamen under the Jones Act are predicated upon the rights and remedies granted to railroad employees covered under FELA, the holding in Mayhew may be extended to FELA litigation.

. Although this case was not tried before a jury, we recognize that, as finder of fact, the trial court filled the role and function of a jury.

. In fact, the Supreme Court specifically noted that the respondent to the writ of certiorari did "not argue that the jury could not have with reason found it liable for the accident, but contended solely that the evidence did not justify the jury’s conclusion that the accident caused the serious illness that followed it." Id., 361 U.S. at 108, 80 S.Ct. at 175.